## THE COLORADO.

### BIRDSALL et al. v. THE COLORADO.

*(Circuit Court of Appeals, Second Circuit. December 5, 1893.)*

COLLISION—STEAMER AND SAILING VESSEL.
    A schooner in the lower bay of New York, outward bound, on a flood tide, by reason of the wind dying away lost steerageway, and drifted

back across the main ship channel, her master intending to anchor when out of the way of vessels; but she was struck and damaged by a steamer coming down the channel without any alteration of course. *Held* that, as the schooner was unable to direct her course, the steamer was liable.

Appeal from the District Court of the United States for the Eastern District of New York.

In Admiralty. Libel by Amos Birdsall and others, owners of the schooner Emilie E. Birdsall, against the steamship Colorado, for collision. Libel dismissed. Libelants appeal. Reversed.

Edward L. Owen, for appellants.

David Thomson, for claimants, appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. This is an appeal from the decree of the district court of the United States for the eastern district of New York, which dismissed the libel of the owners of the schooner Emilie E. Birdsall against the steamship Colorado to recover damages to the schooner occasioned by a collision with the steamer, in the lower bay of New York, at half past 9 o'clock in the morning of November 8, 1891. At the time of the collision, the schooner had left the lower quarantine, bound from New York to Philadelphia. The Colorado was coming down the main ship channel, bound to sea. The weather was clear and fine, and the tide was flood.

The theory of the libelants, as stated in the libel, is as follows: The schooner had nearly reached Sandy Hook, when the wind, which had been light from the northeast, died out, and, being without steerageway, she drifted with the tide and sea back up and across the main ship channel, her master intending to anchor when out of the way of vessels. While so drifting without wind, and near the west side of the channel, the Colorado came down upon a course which would cause collision, continued thereon, and struck the schooner, helpless and unmanageable, upon her starboard side, between the main and fore rigging.

The theory of the owners of the Colorado, as stated in their answer, is as follows: The steamer, by reason of her draught and the condition of the tide, was confined to the middle of the channel for safety, and sighted the schooner when there was a good breeze of about 10 miles an hour from a southerly direction. She was under command, and had steerageway, and knew the steamer's necessary course and position, which at the time were such that the two vessels would pass each other in safety, but she suddenly changed her course, and ran across the bows of the steamer, who immediately stopped her engines, reversed at full speed, and took all measures to avoid the collision, but it was inevitable.

The district court justly regarded the question of the velocity of the wind at the time of the collision as the decisive one in the case. If the schooner's theory as to her helpless condition was wrong, she must be regarded as the author of the collision. If she was unable to direct her course, she should have been avoided by the steamship. The district court was of opinion that upon this

question the weight of the evidence was in favor of the steamer, and dismissed the libel. The libelants were permitted to take, and did take, new proofs for use upon the appeal.

Upon the trial before the district court the officers and crew of the schooner testified in conformity with the allegations of the libel that the wind had died away, the schooner was drifting back, and without steerageway, across the channel; and that the steamship, without alteration of her course, ran into the drifting vessel. A disinterested witness, the captain of the schooner Woodhull, which lay at anchor at the head of the Swash channel, from one-half to three-quarters of a mile from the place of the collision, testified that when, on its account, he was summoned on deck, there was no wind,—none to give a vessel steerageway; that the wind, at times, was a little puffy, and died away after the puffs; and that he was outward bound, without enough wind to go to sea. The witnesses on board the steamship were substantially unanimous in their testimony, which supported the averments of the answer. The anemometer record was produced, which showed that the velocity of the wind at Sandy Hook at 9:30 on that morning was 13 miles per hour, and that after 10 o'clock the wind died out almost entirely, the velocity at 11 o'clock being three miles per hour. The weather observer at Sandy Hook thought that the record correctly shows the velocity of the wind at the place of collision, which is about $2\frac{1}{2}$ miles distant from the observatory. Upon the foregoing testimony the district court justly held that the weight of the evidence was in favor of the steamer.

The additional testimony is from three disinterested witnesses, two of whom were captains of steam tugs, who, at the time of the collision, were near the place where it happened. They testify, in differing phraseology, to the fact that there was no wind. One says: "There wasn't hardly a breath of wind; hardly enough wind to fill a sail. We knowed the schooner couldn't get nowhere." Another says, "She seemed to be drifting with the tide." Another says that before the collision happened the wind was nothing at all; not enough to fill a sail, and not enough to give the schooner steerageway. The captain of the Birdsall turned back from his contemplated voyage on account of the lack of wind, and the captain of the Woodhull was lying becalmed, waiting for a wind to go to sea. The oral testimony of the captains of the two tugboats, who were at that time in the lower bay, looking for employment, is in accordance with the conduct of the captains of the two schooners, and re-enforces the testimony which their acts gave that there was no wind at that place at that time. By reason of the new proofs, the weight of the evidence is changed; the decree of the district court is reversed, with costs, and the case is remanded to that court, with directions to enter a decree for the libelants, and take such further proceedings as to justice may appertain. No costs are to be allowed in the district court prior to the new decree in favor of the libelants.