## WALLING, ADMINISTRATOR OF THE WAGE AND HOUR DIVISION, U. S. DEPARTMENT OF LABOR, *v.* A. H. BELO CORPORATION.

No. 622. Argued April 6, 1942.—Decided June 8, 1942.

*Solicitor General Fahy,* with whom *Messrs. Arnold Raum, Warner W. Gardner, Irving J. Levy, Mortimer B. Wolf, Jacob D. Hyman, George B. Searls, Walter T. Nolte,* and *Norman S. Altman* were on the brief, for petitioner.

*Mr. Maurice E. Purnell,* with whom *Mr. Eugene P. Locke* was on the brief, for respondent.

MR. JUSTICE BYRNES delivered the opinion of the Court.

This is a proceeding by the Administrator of the Wage and Hour Division of the Department of Labor to restrain the respondent corporation from alleged violation of the

626

Fair Labor Standards Act.[1]  The Administrator sought to prevent the use by respondent, under certain contracts with its employees, of wage agreements deemed by the Administrator violative of the time and a half for overtime provisions of § 7 (a)[2] as implemented by §§ 15 (a) (1) and (2).[3]

---

[1] Enforcement of the requirements of the Act by injunction is authorized by § 17. "The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 20 (relating to notice to opposite party) of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, as amended (U. S. C., 1934 edition, title 28, sec. 381), to restrain violations of section 15." 52 Stat. 1069; 29 U. S. C. § 217.

[2] "Sec. 7.  (a)  No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

(1)  for a workweek longer than forty-four hours during the first year from the effective date of this section,

(2)  for a workweek longer than forty-two hours during the second year from such date, or

(3)  for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 52 Stat. 1063; 29 U. S. C. § 207.

[3] "Sec. 15.  (a)  After the expiration of one hundred and twenty days from the date of enactment of this Act, it shall be unlawful for any person—

(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 6 or section 7, or in violation of any regulation or order of the Administrator issued under section 14; except that no provision of this Act shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this Act shall

The respondent, a Texas corporation, is the publisher of the Dallas *Morning News* and other periodicals, and the owner and operator of radio station WFAA. It has some 600 employees. Those in the mechanical departments work under a collective bargaining agreement and are not involved in the present dispute. The others, and particularly those in the newspaper business, work irregular hours. Prior to the effective date of the Act, October 24, 1938, respondent had been paying all but two or three of these employees more than the minimum wage required by the Act. They received vacations of approximately two weeks each year at full pay; special bonuses at the end of the year amounting to approximately one week's earnings; and full pay during periods of illness, sometimes continuing for weeks and sometimes for months. At the time of the trial, 28 superannuated employees were carried on the payroll at full rates of pay. Employees were permitted absences to attend to personal affairs without deductions from pay. When they were required to work long hours in any week, they were given compensating time off in succeeding weeks. Life insurance was carried for them at respondent's expense.

After the enactment of the Fair Labor Standards Act but before its effective date, respondent endeavored to adjust its compensation system to meet the requirements of the Act by negotiating a contract with each of its employees except those in the mechanical departments. These contracts were in the form of letters stating terms which were agreed to by the employees. The following is a typical letter:

excuse any common carrier from its obligation to accept any goods for transportation;

(2) to violate any of the provisions of section 6 or section 7, or any of the provisions of any regulation or order of the Administrator issued under section 14; . . ." 52 Stat. 1068; 29 U. S. C. § 215.

"The Fair Labor Standards Act which goes into effect on October 24, 1938, provides for the following minimum wages and maximum hours of employment:

"First year—25¢ per hour minimum
44 hours maximum per week
"Second year—30¢ per hour minimum
42 hours maximum per week
"Third year—40¢ per hour minimum [4]
40 hours maximum per week

except that employees may work more than the number of hours specified above, provided that overtime rates shall be a minimum of one and one-half times the basic rate.

"In order to conform our employment arrangements to the scheme of the Act without reducing the amount of money which you receive each week, we advise that from and after October 24, 1938, your basic rate of pay will be . . . 67 . . . cents per hour for the first forty-four hours each week, and that for time over forty-four hours each week you will receive for each hour of work not less than one and one-half time such basic rate above mentioned, with a guaranty on our part that you shall receive weekly, for regular time and for such overtime as the necessities of the business may demand, a sum not less than $40. . . ."

In most cases, as in this example, the specified hourly rate was fixed at 1/60th of the guaranteed weekly wage. The result was that during the first year under the Act, when the statutory maximum of regular hours was 44, the employee was required to work 54½ hours before he became entitled to any pay in addition to the weekly guaranty.[5]

---

[4] In later letters this misstatement, immaterial here, was corrected. The minimum wage for the first 40 hours remains 30 cents until October 24, 1945. See § 6 of the Act.

[5] 44 hours at 67 cents equals $29.48; 10½ hours at the statutory minimum overtime rate of $1.00 (150%×$.67) equals $10.50; $29.48 plus $10.50 equals $39.98.

When the employee worked enough hours at the contract rate to earn more than the guaranty, the surplus time was paid for at the rate of 150% of the hourly contract wage. If the employee received an increase in pay, the hourly rate and weekly rate were readjusted.

For eighteen months the system embodied in these contracts was followed to the apparent satisfaction of employer and employees. Respondent was then advised that the arrangement was in violation of the Act and that it was liable to its employees in an amount of from 30 to 60 thousand dollars. It was informed by the regional director in Dallas and by an official in the Administrator's office in Washington that an employee's complaint had precipitated the investigation. These officials declined to give the name of the employee.

Respondent thereupon brought suit for a declaratory judgment in the District Court for the Northern District of Texas, joining the regional director and three of its employees as defendants. The defendant employees answered that they and all the other employees affected by the system approved of it. The regional director moved to dismiss on two grounds, one of which was that he represented none of the employees. The motion to dismiss was denied. 35 F. Supp. 430. In the meantime, petitioner instituted this suit to enjoin respondent from continuing to operate the wage system based upon its contracts with its employees. The two suits were consolidated and tried together. The District Court entered a declaratory judgment for the respondent and dismissed the bill for an injunction. 36 F. Supp. 907.

Petitioner appealed to the Circuit Court of Appeals from the dismissal of its complaint. That Court affirmed the judgment of the District Court. 121 F. 2d 207. It found that the contracts were "actual bona fide contracts of employment" and that "they were intended to, and did, really fix the regular rates at which each employee was

employed." We granted certiorari because of the importance of the question in the administration of the Act.

It is no doubt true, as petitioner contends, that the purpose of respondent's arrangement with its employees was to permit, as far as possible, the payment of the same total weekly wage after the Act as before. But nothing in the Act bars an employer from contracting with his employees to pay them the same wages that they received previously, so long as the new rate equals or exceeds the minimum required by the Act.[6]

The Act requires that for each hour of work beyond the statutory maximum, the employees must be paid "not less than one and one-half times the regular rate at which he is employed." This case turns upon the meaning of the words "the regular rate at which he is employed." Re-

---

[6] Section 18 provides: "No provision of this Act shall justify any employer in reducing a wage paid by him which is in excess of the applicable minimum wage under this Act, or justify any employer in increasing hours of employment maintained by him which are shorter than the maximum hours applicable under this Act." Whatever the legal effect of this language, it is certainly not a prohibition and the Administrator does not rely upon it. The finding of the Circuit Court of Appeals that respondent's effort to maintain the weekly incomes of its employees at their pre-Act level was in good faith gains support from the circumstance that at the very time when respondent was formulating its new wage policy the Wage and Hour Administrator declared:

"Clerical forces, we all feel, are included in the Act. But I cannot see where there is going to be any practical difficulty there because your clerical force in any plant of any consequence certainly is earning on a basis of more than 25 cents an hour weekly wages divided by the hours they work. If they are well above 25 cents an hour, it seems to me that there would not be much question about time and a half for overtime, because you could figure in that weekly wage that time and a half over the 44 hours had been given consideration as remuneration for their full week's pay."

Speech before the Southern States Industrial Council at Birmingham, Alabama, on September 29, 1938. 3 Wage and Hour Reporter 228.

spondent contends that the regular rate under the illustrative contract, which is set out above and to which we shall refer throughout, is 67 cents an hour. Petitioner argues, however, that the 67 cents hourly rate mentioned in the contract is meaningless and that the agreement is, in effect, for a weekly salary of $40 without regard to fluctuations in the number of hours worked each week. Treating the contract as one for a fixed weekly salary, he urges that the regular hourly rate for any single week is the quotient of the $40 guaranty divided by the number of hours actually worked in that week.[7] Under this formula the employee is entitled to the regular hourly rate thus determined for the first 44 hours[8] each week and to not less than one and one-half times that rate for each hour thereafter.

In its initial stage the question to which this dispute gives rise is a question of law, a question of interpretation of the statutory term "regular rate." But it is agreed that as a matter of law employer and employee may establish the "regular rate" by contract. In the case before us, such an effort has been made, and in the example given the regular rate has been specified as 67 cents an hour. The difficulty arises from the inclusion of the $40 guaranty. The problem is whether the intention of the parties to set 67 cents an hour as the regular rate squares with their intention to guarantee a weekly income of $40. The Administrator's position is that these two objectives are inherently inconsistent and that the intention to fix the regular hourly rate at 67 cents is overridden by the intention to guarantee the $40 per week.

We cannot agree. In the first place, when an employee works more than 54½ hours in a single week, he is admittedly entitled to more than the $40 guarantee. The record

---

[7] This has been the Administrator's interpretation of the Act, as set forth in Interpretative Bulletin No. 4, issued October 21, 1938 and revised in November, 1940.

[8] For the first year after passage of the Act; now 40 hours.

632

shows that in such a case, the employee is paid at the rate of $1.00 an hour (150% × $.67) for each hour of overtime. In this situation, then, it is clearly the guaranty that becomes inoperative and the 67 cent hourly rate fixed by the contract that is controlling.

In the second place, although it is perfectly true that when the employee works less than 54½ hours during the week his pay is determined by the $40 guaranty, it does not dispose of the problem simply to say this. The question remains whether the $40 contemplates compensation for overtime as well as basic pay. The contract says that the employee is to receive 67 cents an hour for the first 44 hours and *"Not less than* one and one-half time such basic rate" for each hour over 44. Consequently, if an employee works 50 hours in a given week, it might reasonably be said that his $40 wage consists of $29.48 for the first 44 hours (44 × $.67) plus $10.52 for the remaining six hours (6 × $1.753). To be sure, $1.753 is more than 150% of $.67. But the Act does not prohibit paying more; it requires only that the overtime rate be "not less than" 150% of the basic rate. It is also true that under this formula the overtime rate per hour may vary from week to week. But nothing in the act forbids such fluctuation.

The gist of the Administrator's objection to this interpretation is that both the basic rate and the overtime rate are so "artificial" that the parties to the contract cannot fairly be supposed to have intended that it be so construed. It cannot be denied that the flexibility of the overtime rate is considerable, but this flexibility may well have been intended if it was the only means of securing uniformity in weekly income. Moreover, under the Administrator's interpretation, the regular rate in the example given is $40 divided by the number of hours worked each week. Since the number of hours worked fluctuates so drastically from week to week, this "regular" rate is certainly "irregular" in a mathematical sense. And inasmuch as it cannot be

calculated until after the workweek has been completed, it is difficult to say that it is "regular" in the sense that either employer or employee knows what it is or can plan on the basis of it.

The artificiality of the method urged by the Administrator is accentuated by the nature of his counter-proposal of two plans by which the weekly wage of an employee whose hours vary from week to week may be stabilized. One of these officially approved plans is known as the "time-off plan" and is explained in Interpretative Bulletin No. 4. Under this plan the employment must be placed upon an hourly rate basis with no mention of a guaranty. The pay days must be spaced at intervals of two weeks or longer. If the pay period is set at two weeks and the employee is required to work overtime during the first week, he is given sufficient time off during the second week to keep his paycheck at a constant level. In our view, this counter-proposal far exceeds in technicality the plan adopted by respondent. Moreover, its operation is to provide a ceiling but not a floor for the wage. Since the pay is by the hour and there is no guaranty, in a pay period in which an employee works few hours, his wage may fall far below the level aimed at.

The other officially approved arrangement is known as the "pre-payment plan," and is also explained in Bulletin No. 4. Under this plan, virtually the same arrangement as that which we have been using as an example can stand. That is to say, an employee may be promised 67 cents an hour for the first 44 hours, $1.00 for each hour over 44,[9] with a guaranty of $40 a week. However, in any week in which the employee's earnings at the stated hourly rates do not equal the $40 guaranty, the balance necessary to fulfill the guaranty must be treated as a loan to him. If

[9] It should be noted that respondent's contract, set out above, does not fix $1.00 as the hourly rate for overtime. Instead it provides that the overtime rate shall be "not less than one and one-half" times 67 cents.

in any succeeding week his earnings at the stated hourly rates exceed the guaranty, the excess is withheld by the employer as a repayment of the loan. But if his earnings do not exceed the guaranty in any succeeding week, and after receiving his pay check he does not return to work, the employer is presumed to make an effort to collect the excess amount paid to the employee in a previous week. If the employer does not recover this excess amount, then for all practical purposes the plan operates just as does the plan followed by the respondent in this case. About the only difference is that one is called a "guaranty plan," while the other is called a "pre-payment plan." In the opinion of the Administrator, the "pre-payment plan" is lawful; the "guaranty plan" is unlawful.

But the guaranty contract in this case carries out the intention of the Congress. It specifies a basic hourly rate of pay and not less than time and a half that rate for every hour of overtime work beyond the maximum hours fixed by the Act. It is entirely unlike the *Missel* case, *ante*, p. 572. In the contract in that case, there is no stated hourly wage and no provision for overtime. Under the decision in that case, an employer who engages a worker for a fixed weekly wage of $40 for irregular hours and works him 65 hours (in a year when the maximum workweek is 44 hours), owes the employee $46.38. See *Missel* case. For the same hours under the Belo contract, at the hourly contract rate of 67 cents, the worker would receive $50.48. There is a difference in compensation, but that is the agreement of the parties and it is within the letter and the intention of the law.

The problem presented by this case is difficult—difficult because we are asked to provide a rigid definition of "regular rate" when Congress has failed to provide one. Presumably, Congress refrained from attempting such a definition because the employment relationships to which the Act would apply were so various and unpredictable.

And that which it was unwise for Congress to do, this Court should not do. When employer and employees have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with irregular hours. Where the question is as close as this one, it is well to follow the Congressional lead and to afford the fullest possible scope to agreements among the individuals who are actually affected. This policy is based upon a common sense recognition of the special problems confronting employer and employee in businesses where the work hours fluctuate from week to week and from day to day. Many such employees value the security of a regular weekly income. They want to operate on a family budget, to make commitments for payments on homes and automobiles and insurance. Congress has said nothing to prevent this desirable objective. This Court should not.

*Affirmed.*

MR. JUSTICE REED, dissenting:

The Court holds, "When employer and employees have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with irregular hours." Yet it is recognized by the Court that the validity of the contract "turns upon the meaning of the words 'the regular rate at which he is employed,'" the phrase left undefined by Congress, which it is said the courts also should leave undefined and flexible. Not only does the Court's conclusion assume that the typical Belo contract conforms to the Fair Labor Standards Act by the provision for hourly wages and time and a half for over-

time, but, in the opinion just announced, the Court approves this type contract for hiring, "so long as the new rate equals or exceeds the minimum required by the Act." In so deciding, the Court gives the phrase "regular rate" an interpretation as inflexible and artificial as that which it condemns.

The Court's interpretation that, in the absence of bad faith, any form of contract which assures the payment of the minimum wage and the required overtime complies with the Act may be assumed to be correct. But since the overtime hours must be compensated "at a rate not less than one and one-half times the regular rate at which he is employed," § 7 (a) (3), the regular rate cannot be left without "definition," "flexible" or unfound for this case. And once so found, it must be applied to the circumstances of this litigation. No all-inclusive definition will be attempted. The possibilities of variation in contracts are too great. Certainly, however, the Court does not mean to say that the employer and employee may capriciously select a certain figure, unrelated to the wages paid, and say "That is the regular rate of employment." Every contract of employment is assumed, by the statute, to contain a "regular rate," and for each contract it is a legal, not a factual, conclusion. What that rate is here is the object of our inquiry. Once determined for this case, that conclusion becomes a precedent for other similar contracts and so, in one sense, whether we wish it or not, a definition to be applied in the administration of the Act.

This Court accepts the view that the Fair Labor Standards Act was intended not only to put a floor under wages but also a ceiling over hours. The limitation of hours in turn had two purposes—the spreading of work and extra compensation for overtime, no matter how high the regular wage may be. *Overnight Motor Transportation Co.* v. *Missel, ante,* pp. 572, 577. Since overtime pay must at least equal time and a half the regular rate, as § 7 (a)

specifies, employers and employees may not be permitted to contract in avoidance of the statutory requirement. Contracts for a regular rate per hour conform easily to the requirements, but contracts for compensation in other forms compel an analysis of their terms to find the regular rate. Fixed salaries, as this Court agrees today in *Missel's* case, are to be reduced to hourly rates on the basis of a week as the unit of time. Belo's contract contains elements both of hourly wage and fixed weekly wage contracts. We come then to this point. Are the contracts here involved for weekly wages with variable hours, or for hourly rates with time and a half of such rates for overtime? If the latter, respondent contends the Act has left him free to contract with his employees at such hourly regular rates as may be agreed upon, limited only by the minimum wage requirements. As a court, we must appraise the nature of these contracts and, in my judgment, they are agreements for weekly wages for variable hours, with a provision for additional compensation per hour contingent upon work in excess of an ascertainable number of hours—the number of hours of work required for the wages earned under the hourly wage terms of the contract to equal the guaranty.[1] Until these hours are exceeded, the stipulated wage per hour has no demonstrable effect.

The contracts stated they were drawn to comply with the "scheme of the Act without reducing" weekly wages. The hourly rate was customarily written as one-sixtieth of the weekly wages. The overtime above the maximum hours was set at 150% of the hourly wage or one-fortieth of the weekly. This was then followed by a guaranty that the employee should "receive weekly," for regular and overtime, the former weekly wage. This guaranty was the dominating feature of the contract. Without the guaranty, the adoption of a low hourly rate would encounter

---

[1] Cf. *Carleton Screw Products Co.* v. *Fleming*, 126 F. 2d 537.

the full weight of employee bargaining power. The guaranty avoids this conflict by fixing the minimum weekly wage. This guaranty controls the weekly wage up to 54½ hours of work, the number of hours contracted for by Belo without paying more than the fixed weekly wage. In a 54½ hour week or less, the regular rate should be the guaranty divided by the hours actually worked.

It seems obvious that the guaranty was the heart of the arrangement. The effect of the contract in the illustrative case is to pay 73 cents an hour for work up to 54½ hours and $1.00 (expressed in the circumlocution of time and a half 67 cents) for overtime beyond those hours, with a guaranty that there will be $40 worth of work each week. The "basic" hourly rate, the hours contracted for at the basic rate and the stated percentage paid for overtime may be varied without effect on earnings provided the guaranty and real overtime rate are kept fixed.[2]

The employee willing, the number of hours which must be worked to earn the guaranty can be increased by suitable adjustment of the contract figures of hourly rate, hours contracted and overtime percentages. By such a

---

[2] An example will illustrate the lack of significance of the other numbers in the contract. Varying rates, hours and overtime percentages are substituted for those in the Belo contract quoted in the Court's opinion. "In order to conform our employment arrangements to the scheme of the Act without reducing the amount of money which you receive each week, we advise that from and after October 24, 1938, your basic rate of pay will be [50] cents per hour for the first [29] hours each week, and that for time over [29] hours each week you will receive for each hour of work not less than [double] time such basic rate above mentioned, with a guaranty on our part that you shall receive weekly, for regular time and for such overtime as the necessities of the business may demand, a sum not less than $40.00."

29 hours×$.50=$14.50. 54.5 hours—29 hours=25.5 hours at $1.00 per hour=$25.50. Time plus overtime=$40.00. Thereafter the employee receives $1.00 per hour.

The same is true of a basic rate of $.60 for 36¼ hours and time and two-thirds thereafter, with a guaranty of $40.

verbal device, astute management may avoid many of the disadvantages of ordinary overtime, chief of which is a definite increase in the cost of labor as soon as the hours worked exceed the statutory workweek. If the intention of Congress is to require at least time and a half for overtime work beyond a fixed maximum number of hours (40, 42 or 44 hours), that intention is frustrated by today's holding. Under *Missel's* case, an employer who engages a worker for a fixed weekly wage of $40 for irregular hours and works him 54½ hours a week in a year with a 44 hour maximum, owes $43.86. Under the Belo contract, the worker would receive $40. Because there is no increase of labor cost between the statutory maximum and the hours contracted for (54½), the employer has a financial inducement to require hours beyond the statutory maximum.

As pointed out above, this contract is not only an agreement to pay a fixed wage, $40.00, for variable hours up to 54½, but there is a provision for additional compensation for the hours over the contract maximum. Where the hours worked exceed the number necessary to entitle the employee to hourly pay under the contract, equal in the aggregate to the guaranty, the employee is entitled to receive his regular rate for the statutory maximum hours and 150% of that rate for all overtime. The contracts in most instances fixed the basic rate at one-sixtieth of the guaranty, but the effect of the guaranty, in our view, is to make the regular rate of employment for the precise number of hours necessary under the contract to earn the guaranty, the quotient of the guaranty divided by the hours.[3] For

---

[3] Weekly guaranty—$40. Hours worked—54⅔. Straight hourly contract wage—$40÷60=$.66⅔. Straight contract hours—44. 44×$.66⅔=$29.33⅓. Overtime hourly contract wage—$1.00. Overtime contract hours—10⅔. 10⅔×$1=$10.66⅔. Total contract wage paid—$40. Statutory regular rate—40÷54⅔=$.732 per hour. Statutory maximum hours—44. 44×$.732=$32.20. Statutory overtime

the surplus hours over 54½ the same regular rate continues to be applicable.[4]

It is the guaranty which gives character to these contracts, which determines the amount to be received by the employee under its terms, except in the instances of work beyond 54½ hours. It is only work beyond the 54½ hours which calls for extra pay from the employer. Consequently it seems proper to find the regular rate of employment by using the guarantee as the dividend and the maximum hours possible without increased contract pay as the divisor. The objection that this permits statutory overtime pay to be computed on contract overtime pay springs from the wording of the contract making the guarantee cover overtime up to the 54½ hours. This objection loses its force with the determination that the guaranty fixes the quality of the contract, rather than the so-called basic or hourly rate of pay.

The judgment of the Circuit Court of Appeals should be reversed and this action remanded to the District Court for further proceedings.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this dissent.

---

rate—$1.098. Statutory overtime hours=10⅔. 10⅔×$1.098=$11.71. Total required compensation—$43.91.

[4] Hours worked—60. Statutory maximum hours—44. Regular rate—$.732. 44×$.732=$32.20. Statutory overtime hours—16. Overtime rate—$1.098. 16×$1.098=$17.57. Total required compensation—$49.77.