William E. Colby, of San Francisco, Cal., for defendant.

**ROBERTSON et al. v. ALASKA JUNEAU GOLD MINING CO. et al.**

No. 22658–S.

District Court, N. D. California, S. D.

May 28, 1945.

ST. SURE, District Judge.

Plaintiff sues on behalf of himself and other former employees of defendant to recover overtime payments and liquidated damages alleged by plaintiff to be due under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. The facts, except as hereinafter specified, are undisputed. Defendant operated a large low grade hard rock gold mine at Juneau, Alaska, for about seventeen years. The rock yielded less than $1 a ton, so that it was necessary for defendant to keep operating costs low. It suspended operations in 1944 due to operational losses over a period of approximately a year. The general superintendent of the company testified that the employees were paid wages higher than those paid by any other large hard rock mine anywhere.

When the Fair Labor Standards Act became effective on October 24, 1938, wages formerly paid on the basis of an eight hour day were adjusted to conform to the Act's provision for overtime for hours worked in excess of 44 hours a week, by reducing the hourly rate of pay so that, when added to the overtime rate of pay, or time and a half, it resulted in the employees receiving the same or slightly more wages than they were previously paid. Wages were computed on a weekly basis. This method of computation was held to be proper in Walling v. A. H. Belo Corp., 316 U.S. 624, 630, 62 S.Ct. 1223, 86 L.Ed. 1716. In November of 1938, the wages

were increased a few cents to compensate the employees for loss of time due to enforced lay-offs. In January, 1939, after an election, the CIO was designated as the bargaining agent for the employees. In May of 1939 the company entered into its first formal agreement with the union, continuing in effect the same method of payment, with the same rates of pay as were fixed in November of 1938. The agreement provided for renegotiation of its terms upon thirty days' notice. Under the Weekly plan of payment a man who laid off for a day lost overtime for the week to the extent of his hours of absence. Defendant contends that for this reason the union notified the company that it wished to renegotiate this part of the contract, and demanded that the split-day plan of payment be inaugurated, in place of the weekly method of calculation then in force. Mr. Faulkner, the attorney for the company, conferred in Washington with Mr. Andrews, the then Administrator of the Wage and Hour Division, with regard to the legality of such a plan. The Administrator stated publicly that such a plan was legal and authorized. Plaintiff contends that the plan "was the company's brain-child, not the creature of the union." However, the contention of defendant is supported by the fact that the split-day plan resulted in an increased overall cost to the company, and by the following testimony on the part of plaintiff:

"Mr. Colby: Did you know by any means afterwards or before the union had requested the company to put this split-day plan into operation? A. I heard it discussed probably many times, but it was— the request was made before I knew it was made. * * *

"The Court: You knew there was a demand made? A. Yes."

Defendant's contention that the demand for the change was made by the union is further supported by the recital in the ensuing agreement of October 5, 1939, between the company and the union: "The union has submitted to the company a proposal for computation of pay on the basis of a seven hour day with time and a half for all in excess of said seven hours and the wage scale or schedule based thereon, which proposal the company has accepted." The agreement provided for a daily rate of pay at seven hours regular time and one hour overtime, based on a 42 hour week. The effect of the new wage scale was that an employee who worked a full week received the same amount or slightly more than he received under the agreement of May 2, 1939, whereas a man who laid off during the week received substantially more than he would have received under the weekly method of computing overtime, because he accumulated overtime by the day rather than by the week. Thus the company paid a greater total amount in wages than it had paid under the original plan.

In May of 1940 a new agreement was entered into, altering the basis of calculating the daily rate to 6.6 hours regular time and 1.4 hours overtime, to meet the provision in the Act reducing working hours from 42 to 40 hours per week as of October 24, 1940. This resulted in a slight increase to the employees because of the fractional split of 6.6 hours regular time and 1.4 hours overtime, rather than of 6⅔ and 1⅓.

In December of 1940 the Wage and Hour Division notified the company that the split-day plan of computing wages was a violation of the Act, and threatened to sue the company in West Virginia, the state of its incorporation. The overtime which the Administrator claimed was due was computed by adding regular pay and overtime pay for the split day and adding additional time and a half for the last eight hours of the week. A stipulated judgment was entered in this court (Fleming v. Alaska Juneau Gold Mining Company, No. 21,-834-S) [1] for overtime payments to the employees from the date of the notification by the Wage and Hour Division to May 1, 1941, the date of the change back to the weekly plan of computation. The stipulation upon which the judgment was based recited that "defendant enters into this stipulation solely for the purpose of settling this action without contest, and does not admit any of the allegations of the complaint." Defendant paid its employees the amounts provided for in the stipulated judgment, and in May of 1941 changed back to the 40 hour week base pay and eight hours overtime. The present action seeks liquidated damages for the period covered by the judgment in the Fleming case, and overtime and liquidated damages from April 23, 1940, to December 13, 1940. This court has heretofore held that the

---

[1] No opinion for publication.

statute of limitations has run on claims accruing prior to April 23, 1940.

The validity of the original weekly plan for computation of overtime is not questioned, and is supported by the decision of the Supreme Court in Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 1226, 86 L.Ed. 1716. There the court had before it a similar weekly plan of overtime computation. The court said, "It is no doubt true; as petitioner contends, that the purpose of respondent's arrangement with its employees was to permit as far as possible the payment of the same total weekly wage after the Act as before. But nothing in the Act bars an employer from contracting with his employees to pay them the same wages as they received previously, so long as the new rate equals or exceeds the minimum required by the Act."

The question here is whether by complying with the demand of the employees that the split-day plan be adopted, under which plan the employees received as much, and in many cases, more than they received under the former weekly plan of overtime computation, defendant violated the Act.

Plaintiff relies on Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 12, as authority that the split-day plan in the present case was illegal. In that case the employees had been paid specified wages for each shift of eight, ten or twelve hours daily. After the passage of the Act the first four hours of the eight hour shifts and the first five hours of the ten and twelve hour shifts were designated as "base or regular rate" and the remaining hours as overtime. The effect of the plan was that an employee would be required to work eighty hours a week before he would be entitled to overtime in excess of his former rate of pay. The Supreme Court said, "The actual and regular workweek was accordingly shorn of all significance. * * * respondent's plan made no effort to base the regular rate upon the wages actually received or upon the hours actually and regularly spent each week in working. Nor did it attempt to apply the regular rate to the first 40 hours actually and regularly worked. Instead the plan provided for a fictitious regular rate consisting of a figure somewhat lower than the rate actually received. This illusory rate was arbitrarily allocated to the first portion of each day's regular labor; the latter portion was designated 'overtime' and called for compensation at a rate one and one-half times the fictitious regular rate. * * * The vice of respondent's plan lay in the fact that the contract regular rate did not represent the rate which was actually paid for ordinary, non-overtime hours, nor did it allow extra compensation to be paid for true overtime hours. It was derived not from the actual hours and wages but from ingenious mathematical manipulations, with the sole purpose being to perpetuate the pre-statutory wage scale."

In the present case the contract regular rate was not fictitious or illusory. On the contrary it was legally established by defendant and later agreed upon by the union in the contract of May 2, 1939. Overtime was actually paid at one and one-half times the bona fide regular rate, and employees who worked no overtime received only the regular rate of pay. Therefore the plan in the present case did not have the "vice" found by the court in the Helmerich case. The adoption of the split-day plan was demanded by the union because it was advantageous to employees who were required for any reason to lay off work. It penalized no one but the defendant. It would be incredible if the mere use of the word "split-day" would have the magic power to render illegal a labor contract which was previously legal, even though wages paid thereunder remained the same or were increased. I think the present case does not fall within the rule of the Helmerich case. I conclude that defendant's dealings with its employees were lawful and in good faith, and that plaintiff and the other employees on whose behalf he sues are not entitled to recover.

Defendant reserves, but does not seriously urge, the objection that its operations were not in interstate commerce and that therefore its employees were not covered by the Act. The mining of gold and its transportation across state or territorial lines has been held to constitute commerce within the meaning of the Act. Fox v. Summit King Mines, 9 Cir., 143 F.2d 926; Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102; Sunshine Mining Co. v. Carver, D.C., 41 F.Supp. 60. In view of the decision in the present case, it is unnecessary to discuss this question at length.

Upon the day of the trial plaintiff moves for the first time to join as plaintiffs forty additional former employees of defendant. Defendant interposed vigorous objection to such joinder. The statute of

'limitations had at the time of trial run against the claims of the persons sought to be joined. The motion was untimely, and to grant it would be prejudicial to defendant.·

Defendant may have judgment as prayed for, with costs.

Plaintiff's motion to join additional parties will be denied.