[L. A. No. 20685.   In Bank.   Feb. 1, 1949.]

JACK MARVIN et al., Respondents, v. WILLIAM E. HODGSON, Appellant.

Herbert R. Lande for Appellant.

J. Paul Madsen for Respondents.

SCHAUER, J.—Defendant appeals from a judgment in favor of plaintiffs, his former employes, for certain sums as additional wages, plus liquidated damages and attorney's fees, to which plaintiffs claim to be entitled under the provisions of sections 7 and 16 of the Fair Labor Standards Act of 1938 (52 Stats. 1060; 29 U.S.C.A. §§ 201-219). Defendant contends that he has paid plaintiffs all of the wages to which they are entitled under their contract with him and under applicable law and that, in any event, liquidated damages should not have been awarded.  We have concluded that defendant's first contention must be sustained, that accordingly plaintiffs have no right to further payments from defendant and that the judgment must be reversed.

Defendant was in the business* of supplying guards to certain of the ships of the War Shipping Administration during such times as they were in port at Los Angeles and Long Beach. It is for work performed for defendant during the period of July 16, 1944, to October 31, 1945, in performance of his contract with the War Shipping Administration, that plaintiffs claim they were underpaid. Prior to July 16, 1944, defendant paid the guards, among whom were plaintiffs, at the rate of 92½ cents an hour for all hours worked. The usual workweek was 84 hours, divided into seven days of twelve hours each. Defendant, prior to the mentioned date (July 16, 1944), apparently believing that he was not required to do otherwise, paid no overtime rate for hours worked over 40 a week. Likewise, the War Shipping Administration during the times here involved paid defendant a flat rate of $1.05 an hour for each guard furnished, regardless of the number of hours a week worked by each man; i. e., no overtime rate was paid by the government agency to defendant at any time.

If defendant had paid plaintiffs time and one-half on 92½ cents an hour for hours worked over 40 a week, he would have paid $1.3875 an hour for approximately 44 hours per man per week for work for which he received from the War Shipping Administration only $1.05 an hour; stated another way, defendant would have paid each plaintiff a total of $98.05 for the usual 84-hour workweek, although defendant received only $88.20 per man from the War Shipping Administration for such workweek. It was, of course, beyond the power of defendant to himself change the amount paid him by the government agency. Shortly prior to July 15, 1944, defendant was informed by a representative of the Wage and Hour Division of the United States Department of Labor that that agency had reached the view that defendant "was engaged in interstate commerce, and was bound by the provisions of the Fair Labor Standards Act to pay his employees one and one-half times the regular rate of pay for all hours worked in excess of forty per week." He was advised by letter, according to defendant's testimony, that "they figured, in going over the accounts of the claims that had been made, that I owed close to $3,000 overtime, but inasmuch as I had been able to collect only $1.05, that I was being exon-

---

*During the period prior to July 15, 1944, defendant's business was incorporated; starting on that date he operated as an individual. However, in oral argument before this court he conceded that for the purposes of this case he should be treated as having done business as an individual during all the times involved.

erated from having to pay that . . . They told me they gave until July 15th to make arrangements whereby I could pay overtime . . . He said that the current rate would have to be set, whereby I would pay overtime, if I wished to stay in business . . . They told me I would have to change; . . . that I would have to pay time and a half for overtime, *even if it meant lowering my basic rate.* That is where I got the idea in the first place to stay in business." (Italics added.) Defendant also testified that "As I was only able to collect $1.05, I had been exonerated from paying any penalty" for failure to pay time and a half on 92½ cents an hour prior to July 16, 1944. He testified further that it was necessary that the men work 12 hours a day, seven days a week, because of the shortage of labor and the necessity of covering all the ships in port, and that "If we could have given them a day off, we could have paid a higher rate of wage." Defendant does not dispute the labor department's ruling that subsequent to July 16, 1944, he was bound by law to pay one and one-half times the basic rate for overtime.

The critical question is whether the applicable laws and regulations could be complied with (at least, without the approval of the War Labor Board) only by increasing the total wage paid for the established workweek or whether they were complied with by the voluntary agreement of defendant and plaintiffs providing for continuance of substantially the same total wage for the full workweek but computed and allowed on the basis of less money for the first 40 hours and "time and one-half" for the additional 44 hours.

Section 7 of the Fair Labor Standards Act (29 U.S.C.A. § 207) provides, so far as here material, that an employer in interstate commerce shall not "employ any of his employees . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the *regular rate* at which he is employed." (Italics added.) Subdivision (b) of section 16 of the act (29 U.S.C.A. § 216) states: "Any employer who violates the provisions of section . . . 7 . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction . . . The court in such action shall, in addition to any judgment

awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.''

Confronted with the alternative of going out of business at a time when the services being rendered were sorely needed (the work was classified as ''essential'' in the war effort) or else of lowering the hourly rate of pay for the first 40 hours in order to pay the required overtime rate for hours worked over 40 a week, defendant, with the assistance and advice of plaintiff Marvin, called a meeting of all the guards, for July 14, 1945. Plaintiff Marvin testified that he and defendant's other employes previously ''had been subpoenaed before the Wage and Hour Department'' and knew of the ''difficulty over the payment of overtime.'' At the meeting defendant explained his contract with the War Shipping Administration and proposed to the guards, including plaintiffs, that he thereafter pay them at the rate of 70 cents an hour for the first 40 hours of each workweek, $1.05 an hour for all additional hours worked the first six days of each workweek, and $1.40 an hour for hours worked on the seventh day. The total pay of each man for the 84-hour workweek (which was to be continued) would thus remain approximately the same as prior to the proposed change in hourly rate. In other words, the proposal was neither to increase nor to decrease the total wages actually paid, but merely to adjust the method or basis of computing such wages in order to comply with the law. Defendant specifically told the men that he was receiving only $1.05 an hour from the War Shipping Administration, that he had to meet various expenses (which he itemized, including charges for workmen's compensation, social security and unemployment insurance) of the business, that until and unless he could get more from the War Shipping Administration he could pay them no more than the rates stated, and that ''they could either accept it or reject it.'' Three or four of the guards did not accept the proposal and left defendant's employ, but the others, including plaintiffs, remained on the job and thereafter continued to be paid their wages in substantially the same amounts as before but computed on the new basis.

Plaintiff Marvin testified that he continued working, and ''well understood'' the new wage rates. Others of the guards testified that when the new rates were offered plaintiff Marvin ''made a talk to the boys and he told them for the present we should accept it, we should accept the terms, but that

*we were going after the War Shipping Administration,* that they were doing the best they could, they were trying their very best to get us more money and would eventually get us more money and possibly our back pay from them''; that ''Mr. Hodgson didn't have the money, he never received it, *we were going after the Shipping Administration, not Mr. Hodgson. I knew that Mr. Hodgson did not owe me anything'';* that ''Mr. Hodgson was fighting all the time to get us as much money as he possibly could.'' (Italics added.) Defendant also testified that he persistently attempted, although without success, to secure an increased rate from the War Shipping Administration in order to pay his employes the highest possible wage; that if his employes could earn higher pay elsewhere he freely gave to them the ''availability slips'' that were at that time required for transfering from a ''frozen'' or essential war job such as the guard work here was classified, to other work.

Plaintiffs continued in defendant's employ until October 31, 1945, and received their pay under the new schedule. On November 6, 1945, they filed this action. They urge that because defendant did not secure the approval of the National War Labor Board before putting into effect the new hourly wage-computation schedule to which they had agreed, that they were and are entitled to be paid for the period between July 16, 1945, and October 31, 1945, at the old rate of 92½ cents an hour for the first 40 hours worked each week, plus one and one-half times that rate for all hours in excess of 40 each week; in other words, plaintiffs argue that their ''regular rate'' of pay, as those words are used in section 7 of the Fair Labor Standards Act, quoted hereinabove, remained at 92½ cents an hour, and that the effect of the time and one-half provision for overtime was to give them an increase in total wages over the amounts previously paid. They assert that as a matter of law they are entitled to receive the increase despite their clear understanding of the new wage computation schedule and of the reason and necessity therefor, and despite the fact that they accepted the new schedule insofar as defendant's obligation was concerned and continued working at the changed hourly rates. The trial court held with plaintiffs, judgment was entered accordingly, including liquidated damages and attorney's fees, and defendant appealed.

As previously indicated we think that determination of the case hinges on whether, under all the circumstances, the applicable laws and regulations could be complied with (in

the absence of approval by the War Labor Board) only by continuing the old basic rate for the first 40 hours of each workweek and increasing the rate to "time and one-half" for hours over 40, or whether the parties could lawfully agree on a new schedule of hourly rates which preserved substantially the same total wage for the full workweek but which, by reducing the hourly rate for the first 40 hours and increasing the rate for hours over 40, complied with the requirement for "time and one-half" for the hours over 40. To express it another way, did the applicable provisions of the law and executive regulations, under the circumstances shown, operate by themselves necessarily to increase the total wage for the full workweek or was the agreement of the parties for adjustment of the hourly rates to comply with the required overtime rates but continue substantially the same total wage for the full workweek lawful? We conclude that under the circumstances shown the agreement is not void and that the higher total wage was not imposed by law.

The United States Supreme Court has declared that under the Fair Labor Standards Act "as a matter of law employer and employee may establish the 'regular rate' by contract." (*Walling* v. *A. H. Belo Corp.* (1942), 316 U.S. 624, 631 [62 S.Ct. 1223, 1227, 86 L.Ed. 1716].) In the Belo case, where "the purpose of respondent's arrangement with its employees was to permit as far as possible the payment of the same total weekly wage after the Act as before" by agreeing with the employees upon a new and lower "regular rate" of hourly pay, that court further established that "nothing in the Act bars an employer from contracting with his employees to pay them the same wages that they received previously, so long as the new rate equals or exceeds the minimum [40 cents an hour, § 206 (a) of the act] required by the Act." (316 U.S. at page 630.) Other cases following the Belo holding are *Atlantic Co.* v. *Walling* (1942), 5 C.C.A., 131 F.2d 518, 521; *White* v. *Witwer Grocer Co.* (1942), 8 C.C.A., 132 F.2d 108, 111; *General Mills, Inc.* v. *Williams* (1942), 6 C.C.A., 132 F.2d 367, 370; *Shepler* v. *Crucible Fuel Co.* (1944), 3 C.C.A., 140 F.2d 371, 373; *Bergschneider* v. *Peabody Coal Co.* (1944), 7 C.C.A., 142 F.2d 784, 786; see, also, *Murray* v. *Noblesville Milling Co.* (1942), 7 C.C.A., 131 F.2d 470, 474, cert. den. 318 U.S. 775 [63 S.Ct. 832, 87 L.Ed. 1145]. In the White and the General Mills cases agreements between employer and employe for a "reduced basic hourly rate" under which, with time and one-half for over 40 hours each

week, the weekly pay remained the same as prior to the effective date of the Fair Labor Standards Act, were upheld as valid under the act.

It is thus apparent that defendant's new wage-computation schedule violated no specific provision of the Fair Labor Standards Act and is fairly within the "operation of the act." Plaintiffs contend, however, that the new schedule resulted in "a reduction in the rate" of plaintiffs' pay and that, therefore, under certain provisions of the Stabilization Act of 1942 (56 Stats. 765; 50 U.S.C.A. App. §§ 961-971), and the rules and regulations promulgated thereunder (see, also, section 7 of the War Labor Disputes Act (1943), 50 U.S.C.A. App. § 1507), defendant was required to secure the approval of the National War Labor Board before he could lawfully put the new computation schedule into effect. Plaintiffs rely particularly upon the provisions of subdivision (a) of section 5 of the Stabilization Act of 1942, to the effect that "No employer shall pay, and no employee shall receive, wages or salaries in contravention of the regulations promulgated by the President under this Act," as well as upon the provision of section 1 of title II of Executive Order No. 9250 (50 U.S.C.A. App., p. 315), issued pursuant to authority granted by section 2 of the Stabilization Act of 1942, that "1. No increases in wage rates . . . and no decreases in wage rates, shall be authorized unless notice of such increases or decreases shall have been filed with the National War Labor Board, and unless the National War Labor Board has approved such increases or decreases."

The history of the National War Labor Board and the nature and effect of its orders were reviewed by this court in *Pearson Candy Co.* v. *Waits* (1946), 27 Cal.2d 615, 617-619 [165 P.2d 674], and need not be repeated here. It is sufficient to point out that we there held, in reliance upon federal decisions by which we are bound, that (pp. 618-619) "the board's orders . . . rest simply on an appeal to the moral obligation of the parties and are neither enforceable nor reviewable [by the courts]. [Citations.] . . . 'The National War Labor Board is not, under the law, vested with judicial functions, nor does it have power to enforce its determinations, called "directives," upon the parties to a controversy before it . . .' (*Oil Workers Inter. Union* v. *Texoma Nat. Gas Co.*, 146 F.2d 62, 65.)" (See also *Martin* v. *Campanaro* (1946), 2 C.C.A., 156 F.2d 127, 129.) Moreover, we there noted that it is declared in *Baltimore Transit Co.* v. *Flynn* (1943), 50 F.Supp.

382, 387, that the board "does not exist as a tribunal to determine the legal rights and obligations of employer and employee, or to protect and enforce such rights, but merely to decide how such rights, in the Board's opinion, are to be exercised in the public interest in view of the state of war." It would thus appear that even if defendant here had sought approval by the National War Labor Board of the new wage schedule, he would have been legally free, insofar, at least, as any authority of the National War Labor Board itself is concerned, to disregard any approval or disapproval which the board might have expressed and to adopt or not adopt the new schedule according as he and his employes might agree. Defendant urges that therefore his failure to seek approval of the board cannot have the binding effect of freezing his "regular rate" under the Fair Labor Standards Act at 92½ cents an hour and thereby creating the liability sought to be enforced in this action. Defendant's position in this respect appears to be sound in the light of the applicable court decisions.

The question remains as to whether the asserted liability springs from the Stabilization Act of 1942 and the executive order hereinabove mentioned. It is to be noted at the outset that the purpose of the Stabilization Act is disclosed in section 967 (50 U.S.C.A.) as follows: "In order to aid in the effective prosecution of the war, the President is authorized . . . to issue a general order stabilizing prices, wages, and salaries, affecting the cost of living; and, except as otherwise provided in this Act, such stabilization shall so far as practicable be on the basis of the levels which existed on September 15, 1942. [It does not clearly appear from the record before us whether the defendant was in business on or prior to September 15, 1942, but it seems to be assumed by the parties that they were subject to the Stabilization Act and the executive orders issued thereunder insofar as they may be applicable.] The President may, except as otherwise provided in this Act, thereafter [subsequent to November 1, 1942] provide for making adjustments with respect to prices, wages, and salaries, to the extent that he finds necessary to aid in the effective prosecution of the war or to correct gross inequities." Furthermore, it is to be noted that title II of Executive Order No. 9250 (upon section 1 of which plaintiffs rely) provides (in section 2) that "The National War Labor Board shall not approve any increase in the wage rates prevailing on September 15, 1942, unless such increase is necessary to correct maladjustments

or inequalities, to eliminate substandards of living, to correct gross inequities, or to aid in the effective prosecution of the war . . . [In section 3.] The National War Labor Board shall not approve a decrease *in the wages for any particular work* [italics added] below the highest wages paid therefor between January 1, 1942, and September 15, 1942, unless to correct gross inequities and to aid in the effective prosecution of the war. [In section 4.] The National War Labor Board shall, by general regulation, make such exemptions from the provisions of this title in the case of small total wage increases as it deems necessary for the effective administration of this Order . . . [Title VI, § 1.] Nothing in this Order shall be construed as affecting *the present operation* of the Fair Labor Standards Act.'' (Italics added.) Also, Executive Order No. 9017 by which the National War Labor Board was created prior to congressional authority therefor (see *Pearson Candy Co.* v. *Waits* (1946), *supra,* 27 Cal.2d 615, 617), specifies in section 7 (50 U.S.C.A. App., p. 583) that ''Nothing herein shall be construed as superseding or in conflict with the provisions of . . . the Fair Labor Standards Act . . .'' And it is provided in section 4 of the Stabilization Act of 1942, as amended in 1943 and 1944, that ''No action shall be taken under authority of this Act with respect to wages or salaries, (1) which is inconsistent with the provisions of the Fair Labor Standards Act of 1938, as amended . . .'' (50 U.S.C.A. App. § 964.) From the foregoing quotations it becomes apparent that the purpose of the Stabilization Act and of the executive orders thereunder was to *stabilize* wages, not to force increases or decreases, and not to affect in any way ''the present operation of the Fair Labor Standards Act.''

It has not been shown to us whether the National War Labor Board, in conformity with the directive set forth in the above quoted section 4 of title II of Executive Order No. 9250, ''by general regulation'' made such an exemption ''in the case of small total wage increases'' as would fit this case. The new wage-computation schedule agreed upon as of July 16, 1944, while amounting substantially to a continuation of the former ''total wage'' as to each of defendant's employes actually increased his ''total wage'' approximately 10 cents a day. It does appear to us, however, that such increase of 10 cents a day was negligible (no claim is made that the agreement was void because of such increase) and that the readjustment of the wage-computation schedule was not such a change

in rate of wages as was intended to be proscribed by either the Stabilization Act or the executive orders issued thereunder. The change in basis of computation was not for the purpose of either increasing or decreasing the ''total wage'' for the work which was being performed; it tended directly to keep wages stabilized rather than to change them and was made for the primary purpose of complying with the Fair Labor Standards Act; as in the Belo case, *supra* (*Walling* v. *A. H. Belo Corp.* (1942), 316 U.S. 624, 631 [62 S.Ct. 1223, 1227, 86 L.Ed. 1716]), the agreement ''was to permit as far as possible the payment of the same total weekly wage . . . as before.''

Certainly, if plaintiffs' position were to be upheld, the effect would be to increase both the ''wage rate'' as to 44 hours of each workweek and the ''total wage'' for the work performed. Such increase was just as much debarred by the Stabilization Act and executive orders thereunder as was the decrease in wage rate for the first 40 hours, unless the Fair Labor Standards Act is to control ''unaffected'' in its ''present operation.'' But if the Fair Labor Standards Act does so control, then, as previously shown, the plaintiffs and defendant ''as a matter of law . . . [were free to] establish the 'regular rate' by contract.'' (*Walling* v. *A. H. Belo Corp.* (1942), *supra,* 316 U.S. 624, 631 [62 S.Ct. 1223, 1227, 86 L.Ed. 1716].)

In any event we are satisfied that, under the circumstances here disclosed, the agreement, limited as it was in effect and fairly and openly reached, was not proscribed by the Stabilization Act or the executive orders and, being otherwise valid, is not reached by the Fair Labor Standards Act.

To recapitulate: It is apparent from what has been said that the operation of the Fair Labor Standards Act did not by itself require that the total wage be increased; as long as the basic or ''regular'' wage rate was not less than the minimum wage fixed by law (40 cents an hour at the times here concerned) the parties to the wage-employment contract were free, insofar as the operation of that act is concerned, to establish any basic or ''regular'' rate they might agree upon but were bound to augment that rate for overtime as provided by the act. In other words, operation of the Fair Labor Standards Act merely required that the parties fix (and comply with) a wage-computation schedule as set up by the act. It is further apparent that neither the Wage Stabilization Act of 1942 nor the executive orders promulgated thereunder were intended to ''affect'' the operation of the Fair Labor

Standards Act. Its free operation was carefully preserved by the Congress and by the President. The parties to the employment contract here were bound to comply with it. They did comply with it by making the agreement which has been described. That agreement was not for the purpose of, and it did not result in, either increasing or decreasing in any substantial amount the total wage paid for the work performed; its object was to comply with the act—an object which was not only lawful but which the parties were bound to accomplish. Since wage stabilization was not substantially affected by the agreement we are satisfied that failure to secure the approval of the National War Labor Board to the readjustment of the hourly rate schedule did not avoid such agreement or otherwise result in increasing the total wage for the workweek.

Plaintiffs rely upon *Employers Group, etc. Carriers* v. *National War Labor Board* (1944), D.C. C.A., 143 F.2d 145, and *Wernhardt* v. *Koenig* (1945), 60 F.Supp. 709. In neither of those cases were employes seeking to require their employer to adhere to a former basic or "regular" rate of pay on the ground, advanced here, that by reason of the wartime acts such rate could not be adjusted by agreement in order to comply with the Fair Labor Standards Act. Moreover, in neither of those cases does it appear that the court considered the provisions of the wartime acts and regulations, quoted hereinabove, which indicate the intention that the Fair Labor Standards Act should be "unaffected" by such acts and regulations. Therefore, those cases appear to set forth no applicable principles of law controlling here.

For the reasons above stated, the judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Spence, J., concurred.

TRAYNOR, J.—I dissent.

Until July 16, 1944, defendant paid his employees 92½ cents per hour. Thereafter he paid 70 cents per hour for the first eight hours of any day or 40 hours of any week, $1.05 per hour for all additional hours in the first six consecutive days, and $1.40 per hour for any hours on the seventh consecutive work day. Both before and after the date of the change defendant was subject to the provisions of the Fair Labor Standards Act (29 U.S.C.A. §§ 201-219), which re-

quired him to pay his employees one and one-half times the regular wage rate for any hours exceeding 40 in any week. It is undisputed that defendant was violating the Fair Labor Standards Act by failing to pay overtime before July 16th and that the subsequent change in the rate of wages was not approved by the National War Labor Board. After plaintiffs learned that defendant had not secured the approval of the War Labor Board for the reduction in the rate of wages, they brought this action to recover the difference between the amount they had received and the amount to which they were entitled under the old rate together with liquidated damages and attorney's fees as provided in the Fair Labor Standards Act.

Section 5(a) of the Stabilization Act of 1942 provided: "No employer shall pay, and no employee shall receive, wages or salaries in contravention of the regulations promulgated by the President under this Act." (50 U.S.C.A. App. § 965.) Executive Order No. 9250, issued pursuant to the authority of the act, provided in part: "1. No increases in wage rates . . . and no decreases in wage rates, shall be authorized unless notice of such increases or decreases shall have been filed with the National War Labor Board, and unless the National War Labor Board has approved such increases or decreases." (50 U.S.C.A. App., p. 315.) Plaintiffs contend that under these provisions the revision of the wage rate without the approval of the board was ineffective and void, so that the old rate remained in full force and effect.

Defendant states that this view is contrary to that expressed in *Pearson Candy Co.* v. *Waits,* 27 Cal.2d 615, 619 [165 P.2d 674], that "the board's orders . . . rest simply on an appeal to the moral obligation of the parties and are neither enforceable nor reviewable. [Citations.]" Defendant contends that since he would be under no duty to comply if the board ordered him to change his rates, his failure to secure approval of a change in rates would not render them invalid. This contention, however, overlooks the dual function of the War Labor Board. The Pearson case and other cases enunciating the same rule were concerned with directive orders of the board issued pursuant to its authority under the War Labor Disputes Act of 1943 (50 U.S.C.A. App. §§ 1501-1511) to issue orders designed to settle labor disputes brought before it. This power of the board to issue directive orders in cases of labor disputes was distinct from its power to approve or reject changes in wage rates under Executive Order No. 9250. In exercising the latter power the board did not order any-

thing; it merely approved or failed to approve suggested wage rate changes that were filed with it. It was the statute and the executive order, not a directive of the board, that prohibited wage rate changes if approval was not granted. Any change in wage rates without such approval was ineffective and void. (*Wernhardt* v. *Koenig,* 60 F.Supp. 709; *Kells* v. *Boutross,* 184 Misc. 206 [53 N.Y.S.2d 734]; *Claude S. Bennett, Inc.,* v. *Bollinger,* 72 Ga.App. 531 [34 S.E.2d 563].)

The majority opinion nevertheless takes the position that the rate adjustment was designed merely to comply with the Fair Labor Standards Act and did not in fact constitute such a change in the take-home pay as to require approval of the War Labor Board. This position is untenable.

The take-home pay actually received under the two wage rates was not substantially the same unless a full 84-hour seven-day week was worked, and the evidence shows that frequently the full week was not worked. Defendant's witness Potts testified that he and many others did not work full weeks after the rate change; neither did plaintiffs, as is clear from the records of their time and overtime. The following table illustrates the wages that were actually paid under the two systems for various work weeks.

|  | 92½ cents per hr. with no overtime | 70 cents per hr. with overtime and doubletime |
|---|---|---|
| Forty hours, five days | $37.00 | $28.00 |
| Forty-eight hours, six days | 44.40 | 36.40 |
| Seventy-two hours, six days | 66.60 | 61.60 |
| Eighty-four hours, seven days | 77.70 | 78.40 |

Since the take-home pay varied with the number of hours worked, this case is not similar to *Walling* v. *A. H. Belo Corp.,* 316 U.S. 624 [62 S.Ct. 1223, 86 L.Ed. 1716]. In that case the employment contract provided for a regular hourly rate to be paid with time and one-half for overtime and also for a weekly minimum wage that was to be paid regardless of the hours actually worked. The relation between the hourly rate and the weekly minimum was such that in practice the employees seldom if ever received other than the weekly minimum. The court there held that the parties could fix the regular hourly rate for the purposes of the Fair Labor Standards Act by contract and rejected the contention that for each week the regular rate should be determined by dividing the weekly minimum by the number of hours actually worked. If defendant had a weekly minimum that in fact governed

the take-home pay regardless of what was earned on the basis of either the 92½ or 70-cent hourly rate, there might be some merit in the position that the attempted change in the hourly rate did not violate the Stabilization Act. Defendant had no such minimum, however, and the wages actually paid were based solely on the hourly rates and the time actually worked. Furthermore, the working of the 84-hour seven-day week was not such an invariable practice that the wages actually paid before and after the attempted change in the hourly rate remained substantially the same.

Even if it be assumed that the wages actually paid remained the same after the change in the wage rate, the wages to which plaintiffs were entitled were sharply reduced by the change. Although plaintiffs received only $77.70 for working an 84-hour week before the attempted wage rate change, they were entitled by virtue of the Fair Labor Standards Act to receive $98.05. Under the changed rate they were entitled to only $78.40 for the same number of hours. To hold that the rate in fact remained the same is to hold that plaintiffs had no right to overtime pay under the old rate before the adjustment. This holding would be valid, however, only if the Stabilization Act and Executive Order No. 9250 had the effect of freezing wages at the amounts actually being paid rather than at the amounts to which employees were entitled by virtue of the Fair Labor Standards Act in cases where that act was being violated. The Stabilization Act, however, specifically provided that it was not to have this effect: ''No action shall be taken under the authority of this Act with respect to wages or salaries, (1) which is inconsistent with the provisions of the Fair Labor Standards Act of 1938 . . .'' (50 U.S.C.A. App. § 964.) Before the rate adjustment plaintiffs had a right to greater wages than they were receiving. That right could have been enforced by an action under the Fair Labor Standards Act. Under the adjustment, they would no longer be entitled to more wages than they actually received. It is clear, therefore, that even if the wages paid for an 84-hour week remained substantially the same, the result of the adjustment was to reduce the wages to which plaintiffs were entitled.

Since defendant's change in his hourly wage rate resulted not only in a change in the wages actually paid in many cases, but in substantial changes in the wages to which his employees were entitled in all cases, the wage change required the approval of the War Labor Board.