### WALLING v. WALL WIRE PRODUCTS CO.
### No. 10245.

Circuit Court of Appeals, Sixth Circuit.
March 17, 1947.

Writ of Certiorari Denied May 19, 1947.
See 67 S.Ct. 1351.

MILLER, Circuit Judge, dissenting

———◆———

Morton Lifton, of Washington, D. C. (William S. Tyson, and Bessie Margolin, both of Washington, D. C., Aaron A. Caghan, of Cleveland, Ohio, and Morton Liftin and Flora G. Chudson, both of Washington, D. C., on the brief), for appellant.

S. B. Fortenbaugh, Jr., of Philadelphia, Pa. (Samuel B. Fortenbaugh, Jr., of Philadelphia, Pa., and Edward S. Reid, Jr., of Detroit, Mich., on the brief; Shields, Clark, Brown & McCown, of Philadelphia, Pa., and Miller, Canfield, Paddock & Stone, of Detroit, Mich., of counsel), for appellee.

Before HICKS, McALLISTER, and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The Administrator of the Wage and Hour Division of the United States Department of Labor brought proceedings to enjoin the Wall Wire Products Company from violating the "overtime" provisions

of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Both sides moved for summary judgment. The district court dismissed the Administrator's motion and granted that of the company, denying the injunctive relief; and the Administrator has appealed.

The facts are not in dispute. The Wall Wire Products Company, appellee, is engaged in the business of manufacturing refrigerators, and employs more than 100 workers, producing goods for interstate commerce. Appellee company entered into a collective bargaining agreement with its employees, providing for specified minimum hourly rates of pay for the various classifications of employees, and also for payment to its employees of 25% of the company's profits after deduction of a stated payment of interest on borrowed money. It was stipulated that the distribution of this share of dividends should be made monthly, but that in the event the total annual profits exceeded the sum of the monthly profit figures on which the company had paid during the year—that is, the 25% share to employees—then the company would pay 25% additional on such excess in the form of a year-end distribution. If the total annual profit were less than the sum of the monthly profits on which the monthly payments had been made, the deficit, it was provided, should in no way be imposed upon the employees; nor should any monthly losses be imposed on them. The employees were to be paid the share of the profits on the basis of the actual number of hours worked straight time, regardless of the total number of hours worked. In other words, they would not be paid profit sharing for overtime. The profits to the employees were to be paid— and were paid—without regard to the classification, rates, and standards for jobs as set forth in the contract, and without regard to the individual skills, wages, or salaries of the recipients, and without regard to the overtime worked by recipients. In 1941, a total of $26,223 of profits was paid to the employees in accordance with the contract; in 1942, the sum of $5,540 was similarly paid; and in 1943, the sum of $17,610 was similarly paid. The present proceedings were commenced on April 14, 1944.

The Administrator, appellant herein, alleged that appellee had violated Section 7 of the Act, which provides that no employer shall employ "any of his employees who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty hours, * * *, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." The employees of appellee company, as above mentioned, receive their compensation from the company in hourly rates of pay, and also in a share of the company's profits.

The Administrator claims that the "regular rate" of pay, within the meaning of the statute, is the aggregate of the hourly rates of pay and the amount of profits received by the employees. If this is so, the overtime rate of pay would be one and one-half times the amount which the employee receives as a result of the combined share of profits and hourly rate of pay. The company says that the share of profits is no part of the regular rate of pay, and it has not, in the past, been figuring such share of profits received by employees as part of the regular rate of pay, in computing overtime, as "one and one-half times the regular rate." It is the failure of the company to include the share of profits together with the regular rate, in computing overtime pay, that the Administrator says is a violation of the Act.

This case turns upon the meaning of the statutory words, "the regular rate at which he is employed." Concluding his opinion in Walling v. A. H. Belo Corp., 316 U.S. 624, 625, 62 S.Ct. 1223, 1228, 86 L.Ed. 1716, Mr. Justice Byrnes observed: "The problem presented by this case is difficult—difficult because we are asked to provide a rigid definition of 'regular rate' when Congress has failed to provide one." However, in Walling v. Helmerich & Payne, 323 U.S. 37, 41, 42, 65 S.Ct. 11, 14, 89 L.Ed. 29, the court remarked that while the words "regular rate" are not defined in the Act, they obviously mean the hourly rate actually

paid for the normal, non-overtime work-week. "The Act clearly contemplates the setting of the regular rate in a bona fide manner through wage negotiations between employer and employee, provided that the statutory minimum is respected. But this freedom of contract does not include the right to compute the regular rate in a wholly unrealistic and artificial manner so as to negate the statutory purposes. Even when wages exceed the minimum pre-scribed by Congress, the parties to the con-tract must respect the statutory policy of requiring the employer to pay one and one-half times the regular hourly rate for all hours actually worked in excess of 40." Furthermore, in Walling v. Youngerman-Reynolds Hardwood Co., Inc., 325 U.S. 419, 424, 65 S.Ct. 1242, 1245, 89 L.Ed. 1705, it was said: "As long as the minimum hourly rates established by Section 6 are respected, the employer and employee are free to establish this regular rate at any point and in any manner they see fit. They may agree to pay compensation according to any time or work measurement they de-sire. * * * The regular rate by its very na-ture must reflect all payments which the parties have agreed shall be received reg-ularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of pay-ment the determination of the regular rate becomes a matter of mathematical computa-tion, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts."

As was remarked by Mr. Justice Reed, in his dissenting opinion in Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 1230, 86 L.Ed. 1716: "Contracts for a regular rate per hour conform easily to the requirements but contracts for compen-sation in other forms compel an analysis of their terms to find the regular rate." What, then, is the regular rate of pay in a case like the one before us? It must be the total compensation agreed upon and received by the employees, not including overtime. The contract before us is a con-tract for compensation embodying both the payment of a regular rate per hour as well as a share of the profits. The total com-pensation agreed upon was the hourly rate of pay specified in the collective bargaining contract, plus the share of profits which it was agreed all employees would receive by way of additional compensation. When the hourly rate specified in the contract is augmented by the share of profits properly allocated to the hours during the period for which the share was paid, the result is the hourly "regular rate at which he (the employee) is employed."

Counsel for appellee contend in this case that the "regular rate" of compensation under the Act is the real rate paid to the employees during the workweek, as spe-cified in the collective bargaining contract, exclusive of overtime and independent of "market place contingencies." This was, in effect, the view of Chief Justice Stone, as expressed in his dissenting opinion in Walling v. Harnischfeger Corp., 325 U.S. 427, 440, 65 S.Ct. 1246, 1250, 1253, 89 L.Ed. 1711, Mr. Justice Roberts concurring, in which it was said that "nothing in the Fair Labor Standards Act bars an employer from contracting to pay his employees min-imum hourly rates for time plus one and a half times those rates for overtime in ex-cess of the minimum statutory rates, with a lump sum weekly guaranty which in some weeks exceeds the wage at the stipu-lated hourly rate." It was further re-marked that Congress had not "adopted any policy penalizing employers who are so misguided as to add a bonus to a guar-anteed lawful minimum hourly wage for time and overtime," 325 U.S. at page 441, 65 S.Ct. at page 1254, 89 L.Ed. 1711. In his opinion, Chief Justice Stone relied upon the decision of the Supreme Court in Wal-ling v. A. H. Belo Corp., supra, which he observed was in flat contradiction to the opinion in the case then under considera-tion; and it has since been remarked that "if the Supreme Court has not repudiated its holding in the Belo case, it has come so close as to leave no room for its application except upon an identical state of facts." Walling v. Uhlmann Grain Co., 7 Cir., 151 F.2d 381, 383; see also Walling v. Rich-mond Screw Anchor Co., 2 Cir., 154 F.2d 780, 784. In any event, the contentions of appellee's counsel, as above mentioned,

must be disposed of in favor of the Administrator in accordance with the majority opinion in the Harnischfeger case, in which similar issues were clearly enucleated; and we are here precluded from reanimating that controversy, were we disposed otherwise so to do.

In commenting upon the Administrator's contention that, in the language of the Harnischfeger case, the courts look "to the actual payments * * * which the parties have agreed shall be paid during each workweek," counsel for appellee submit that annual profit sharing, however distributed, is not so paid and cannot be determined until a year of contingent factors has elapsed. They contend, therefore, that any reasonable meaning of the "regular rate" of compensation, as used in the statute, must be completely eliminated by judicial construction, if such a variable as profit sharing is included in the compensation subject to overtime. But in the Harnischfeger case, the employees received "regular though fluctuating amounts for work done during their non-overtime hours in addition to their basic hourly pay" (325 U.S. at page 430, 65 S.Ct. at page 1248, 89 L.Ed. 1711) ; and as for appellee's contention that the share of profits could not be determined until subsequent to the working week to which they are allocated, it is said in the same case: "Respondent also points to the fact that the incentive bonuses are often not determined or paid until weeks or even months after the semi-monthly paydays * * *. But Section 7(a) does not require the impossible. If the correct overtime compensation cannot be determined until some time after the regular pay period the employer is not thereby excused from making the proper computation and payment. Section 7(a) requires only that the employees receive a 50% premium as soon as convenient or practicable under the circumstances" 325 U.S. at page 433, 65 S.Ct. at page 1249, 89 L.Ed. 1711. That the bonus payments are not made weekly or monthly is, therefore, of no consequence. The significant fact is what the parties agree the employees shall receive—by way of wage scale or share of profits, or both—for the workweek, although the exact sum may not be susceptible of computation, un-

til at some period subsequent to the time in which it is earned.

If, in this case, the share of profit were not included in the "regular rate," or in the computation of overtime, the result would be unrealistic and destructive of the legislative intent, for "A full 50% increase in labor costs and a full 50% wage premium, which were meant to flow from the operation of Section 7(a), are impossible of achievement under such a computation." See Walling v. Harnischfeger Corp., supra, 325 U.S. at page 431, 65 S.Ct. at page 1249, 89 L.Ed. 1711. "It matters not how significant the basic hourly rates may be in determining the compensation in situations where incentive bonuses are not paid. When employees do earn more than the basic hourly rates because of the operation of the incentive bonus plan the basic rates lose their significance in determining the actual rate of compensation."

In Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, cert. den. Richmond Screw Anchor Co. v. Walling, 328 U.S. 870, 66 S.Ct. 1383, it was held that a bonus voluntarily paid regularly to employees as compensation, by resolution of a corporation's board of directors, and which was not regarded by the employees as part of their salary, constituted part of the "regular rate" at which the men were employed, and was required to be included in the computation of overtime pay, notwithstanding that the bonus payments could be discontinued at any time that the company saw fit to cancel them. Moreover, in Walling v. Garlock Packing Co., 159 F.2d 44, 45, defendant had promulgated "a wage premium plan" under which its employees were to receive regular "wage premiums" or bonuses. Under the plan, an amount of money equal to the dividend declared on a certain number of shares of the company's common stock was paid each quarter to each hourly-paid employee who had worked for six months. The number of imaginary shares on which the payment was based varied from employee to employee, according to the length of his service with defendant, starting with five shares for six months' service, with an additional five shares for each further service of six months, up to a maximum of 50 shares for

service of nine years or more. The plan was based on a 40-hour workweek. Employees working 40 or more hours per week received the full bonus payment. Employees working fewer hours per week during the quarter preceding the dividend received only that portion of the premium which their average hours of work bore to 40 hours. In holding that such wage premiums or bonuses were part of the "regular rate" of pay which an employee received, it was said that although the exact amount to be received by an employee was not susceptible of being exactly computed by the employee before the dividend was actually declared, this did not affect its character as regular wages, for the employees knew that the payments would come, although they did not know the exact size of their bonuses or premiums. It was further stated: "Moreover, when defendant determined the size of the dividend, an action governed in the main by considerations other than the wage bonus, the amount of the bonus became fixed and absolute and each employee could then calculate his premium."

■ From what has been said, it follows that it is not necessary that the exact amounts that go to make up the "regular rate" of pay be known at the time the work is done by the employee. They may not be susceptible of computation until a later date, but that makes no difference in computing the regular rate. Furthermore, it is not necessary that the regular rate of pay be uniform in amount from workweek to workweek. It may be subject to fluctuation because of different component factors such as the amount of production, the size of dividends upon which they may be dependent, or, as in this case, upon profits which are variable factors; neither is it important that the bonuses or shares of profit paid to the employees are unrelated to their classifications, rates, and standards for jobs, as set forth in the contract, nor based upon their individual skills, wages, salaries, or accomplishments. This con-clusion is consonant with the Administrator's official interpretation of bonus payments in their relation to the regular rate and the overtime rate, in which he has determined that bonuses distributed on the basis of a fixed percentage of an employer's profits are to be considered as a part of the regular rate at which an employee is employed, and must be included in computing his regular hourly rate of pay and overtime compensation. Rules R-1546 and R-1548(a), issued September 2, 1941. While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act, and acting with the advice of a staff specializing in its interpretation and application. See Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, note on page 580, 62 S.Ct. 1216, 86 L.Ed. 1682.

■ We are well aware that the distribution of profits in the past in this case has been made exactly as requested and devised by the employees through their duly selected bargaining agent; that there nowhere appears any disposition on the part of appellee to circumvent the Fair Labor Standards Act; and that the distribution of the share of profits to the employees which is sought by the Administrator may present time-consuming and complicated problems of computation and accounting. But according to the language of the Act as passed by Congress and construed by authoritative decisions which here govern our determination, we are constrained to hold that the share of profits agreed to be paid the employees must be considered a part of the "regular rate" of pay in computing overtime rates.

In accordance with the foregoing, the judgment of the district court is reversed, and the case remanded for the issuance of an injunction.

MILLER, J., dissents from the foregoing opinion.