## McCOMB v. SHEPARD NILES CRANE & HOIST CORPORATION.

### Civ. No. 2631.

District Court, W. D. New York.

June 19, 1947.

William S. Tyson, Acting Sol., Jester S. Ray, Associate Sol., and John J. Babe, Asst. Sol., all of Washington, D. C., and Irving Rozen and John A. Hughes, Regional Attys. James V. Altieri, Senior Atty., and Samuel Gorin, Associate Atty., all of New York City, all of the U. S. Dept. of Labor, for plaintiff.

Burke & Burke, of Elmira, N. Y. (Eugene J. Donnelly, of Buffalo, N. Y., of counsel), for defendant.

KNIGHT, District Judge.

The plaintiff sues to enjoin the defendant from violating Sections 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A. §. 215(a) (1) and (2). The defendant is a New York corporation engaged in the production, sale and distribution in interstate commerce of electric cranes, hoists, and allied products. It employs and has employed about 500 employees, and since on or about January 1, 1941, at different intervals during each year down to June 1, 1945, it has paid these employees certain alleged bonus payments. These were in addition to other types of bonus payments not in question here.

It is alleged that the bonus payments in question are part of the regular rates at which these employees were employed within the meaning of Section 7 of the Act aforesaid, 29 U.S.C.A. § 207; that defendant has repeatedly violated and is violating Sections 7 and 15(a) (2) of the Act in employing many of its employees for work weeks longer than 40 hours, without compensating them at rates not less than one and one-half times the regular rates at which they were employed, and further that defendant has repeatedly violated and is violating aforesaid Section 15(a) (1) in that since October 24, 1940, it has shipped, delivered, transported, offered for transportation and sold in interstate commerce goods in the production of which many of its said employees were employed.

Defendant denies committing any violations and as an affirmative defense alleges that the bonus payments in question herein

do not constitute regular wages within the meaning of the aforesaid Act, but that all these have been completely discretionary with the management of the defendant as to the amount, time of payment, method of payment or whether payment were to be made at all, and "hence, are not regular rates at which employees are employed."

The decision of this case turns on the connotation of the term "wages" as used in the Act. The only definition given in the Act reads as follows:

"(m) 'Wage' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U. S.C.A. § 203(m).

The Administrator, in a published interpretative statement, has included bonus plans as falling within two general categories, as follows:

" 'A. In bonus plans of the first category, the payment and the amount of the bonus are solely in the discretion of the employer. The sum, if any, is determined by him. The employee has no contract right, express or implied, to any amount. This type of bonus is illustrated by the employer who pays his employees a share of the profits of his business or a lump sum at Christmas time without having previously promised, agreed or arranged to pay such bonus. In such case, the employer determines that a bonus is to be paid and also sets the amount to be paid.

" 'Bonus payments of this type will not be considered a part of the regular rate at which an employee is employed, and need not be included in computing his regular hourly rate of pay and overtime compensation.' " Walling v. Richmond Screw Anchor Co., 154 F.2d 780, 782.

Payments made under category B are considered by the Administrator a part of the regular rate of pay (quoted at pages 782, 783 of 154 F.2d).

Defendant contends that the bonus payments in question fall within category A, and quotes prior interpretative statements of the Administrator, which use the same language as that just quoted. This language is also found in the U. S. Department of Labor release, dated February 5, 1945, attached to plaintiff's brief.

█ In Walling v. Wall Wire Products Co., 6 Cir., 161 F.2d 470, at page 475. It is said: "While the interpretative bulletins are not issued as regulations under statutory authority, they do carry persuasiveness as an expression of the view of those experienced in the administration of the Act, and acting with the advice of a staff specializing in its interpretation and application. See Overnight Motor Transp. Co. v. Missel, 316 U. S. 572, note on page 580, 62 S.Ct. 1216, 86 L.Ed. 1682."

The pertinent facts of the instant case have been stipulated in writing.

In December of 1936, 1937 and 1939, defendant paid bonuses of $20 to employees whose rates were 54 cents an hour or less; of $25 to those with rates of 55–64 cents an hour; of $30 to those with rates of 65–74 cents an hour; $35 to those with rates of 75 cents an hour or more. Employees hired after July 1 and before October 1 of each of those years received $10. Those hired after October 1 received no bonus.

These three bonuses were paid pursuant to resolutions of defendant's board of directors dated 11/17/36, 11/16/37 and 11/21/39. These resolutions were unanimously carried. All three read as follows: "Resolved, That additional compensation for services rendered be paid before Christmas to all hourly rate employees who are on the payroll at the time of this payment, such compensation to be calculated on a basis determined by the management, the amount in total not to exceed (respectively $8,000, $10,000, and $7,800)."

On August 21, 1940, the following resolution was carried: "Resolved, That additional compensation for services rendered be paid the last week in August to hourly rate employees, such compensation to be calculated as in the past on a basis determined by the Management, the amount in total not to exceed one week's normal pay." This bonus was paid on August 29, 1940, the amount and basis being the same as in the years 1936, 1937 and 1939. Employees hired after March 1, 1940, but before June

1, 1940, got $10. Those hired after June 1, 1940, got nothing.

On November 19, 1940, a similar resolution was carried, providing that the payment be made in December. The same kind of bonus was paid on December 19, 1940. Employees hired after July 1, 1940, but before October 1, 1940, got $10. Those hired after October 1, 1940, got nothing. "In addition to the regular authorized payments, $10.00 was added to those employees with service of five years or over and $5.00 to those employees in the defendant's service from three to five years."

On February 18, 1941, a similar resolution was carried, providing that the payment be made on February 27. On that date the same kind of bonus was paid. Employees hired between September 1 and December 1, 1940, got $10. Those hired after December 1, 1940, got nothing.

On May 12, 1941, the following resolution was carried: "Resolved, That additional compensation for services rendered be paid May 22, to hourly rate employees, such compensation to be calculated on a basis determined by the management." On that date the same kind of bonus was paid. Employees hired between December 1, 1940, and March 1, 1941, got $10. Those hired after March 1, 1941, got nothing.

By similar resolutions bonuses in the same amounts and based on the same wage categories were paid to all hourly rate employees on July 2, August 19, October 23 and December 18 of the year 1941. Bonuses were paid on April 2, 1942, based on a graduated scale, ranging from $30 to those employees whose wage rates were 40¢ an hour or less, to $79 to those whose wage rates were $1.05 and above. On July 2, 1942, bonuses were paid on a new graduated scale, ranging from $40 to those employees whose wage rates were 40¢ an hour or less, to $100 to those whose wage rates were $1.01 an hour to $1.05 and more. This new wage category was used in the bonus payments made on October 1 and December 17 of the year 1942, on April 1, July 1, September 30 and December 16 of the year 1943, and on March 30, June 29 and September 28 of the year 1944. Bonus payments on a new graduated scale, ranging from $32 to employees whose wage rates

were 40¢ an hour or less, to $80 to those whose rates were 96¢ an hour and above, were made on December 21, 1944, and on March 29 and June 28 of the year 1945. Except on August 19, 1941, additional bonus payments in flat sums were made to a few key hourly rate employees. None of these exceeded $125.

These bonus payments were made to employees who were on defendant's payroll on a date specified in each resolution. Those who were employed between recent specified dates got only $10. Those who were later employed got no bonus.

In connection with the bonus payment made on April 1, 1943, "The following instructions approved by S. Buckley, president of the defendant, were issued by the defendant relative to the bonus payments being made:

" 'Re Victory Tax—Bureau of Internal Revenue circular V. T. page 3 refers to bonuses. We assume from this, that the bonus will carry a 5% tax on total amount unless the regular pay is less than $12.00 for the week, in which case make up the balance of the $12.00 out of the bonus.' "

"The following instructions were issued by the defendant with relation to the bonus payments to be made of September 30, 1943 * * *

" 'Re: Withholding Tax—Bonuses will carry a straight 20% Withholding Tax when paid on a regular weekly pay period unless the party receiving the bonus has no regular earning for that pay period. Then, the usual exemptions apply to the bonus.' "

It is stipulated that: "For each bonus distribution * * *, any hourly rate employee who had remained in attendance during the qualifying period and on the payroll date for each such distribution and who had worked throughout the particular bonus period received the full amount of the bonus paid. It was the general practice * * * to pay no bonus to an employee who had not worked at all during the particular bonus period unless the management deemed the absence of the employee excusable. It was the general practice * * * to pay employees who had been absent during any portion of the bonus period the full amount of the bonus unless in the opinion of the manage-

ment the absence of the said employee was inexcusable. There were a few instances in which a particular employee worked a portion of the bonus period and received a fractional amount of the bonus."

Defendant did not include any of aforesaid bonus payments as part of the regular rates of pay. Employees to whom the bonus payments were made worked hours in excess of 40 hours per week.

On August 23, 1943, defendant made application to the National War Labor Board asking approval to continue said bonus payments. The Board, on 9/20/43, ruled: "You may continue to pay quarterly bonuses in the same amounts as were paid prior to October 3, 1942 without War Labor Board approval."

In December, 1943, an election was held under auspices of the National Labor Relations Board to determine whether defendant's employees wished to have as their exclusive bargaining agent the International Association of Machinists, A. F. of L. Before this election, defendant "sent a letter to each of its employees together with a report of total payments from the company to the individual employee during the first nine months of 1943." In this letter defendant said: "We are proud to state, that, in this small community, our maximum wage payments with incentive bonus, exceed, in all cases, the War Labor Board approvable rates for the Elmira area. We have paid prosperity bonuses to the employees in a greater amount than any plant in this section of the State. It is our hope that we will be able to contribute to the prosperity of the Montour Falls community for many years." Enclosed in each letter was a slip showing the total payments to the respective employee for the first nine months of 1943. These amounts "reflect all hourly earning, incentive bonuses and bonuses described in this stipulation in Paragraphs 3 to 26 inclusive."

It is stipulated that: "If some of the employees who had received the bonus payments described in (said paragraphs) were called to testify * * * they would testify that on March 30, 1944, all employees involved in the bonus distribution received, together with their bonus payment, cards, a copy of which is * * * marked Exhibit 'F' and that in December 1944, March 1945 and June 1945 similar cards were included in the envelopes in which the bonus payments were made. They would further testify, however, that during (said) period * * * they expected to continue to receive these bonus payments and * * * regarded (them) as an integral part of the total earnings received for the work performed for the defendant; and further that this expectation and assumption was predicated on the fact that the bonus payments had been made at recurrent intervals as described in this stipulation over a substantial period of time."

Said Exhibit F reads as follows: "In appreciation of your earnest cooperation and with the desire to reward deserving employees, the Management presents you with this Bonus Compensation in addition to your regular wage. It is our hope that we will be able to pay more prosperity bonuses in the future. Future bonuses, however, are always uncertain since they have to depend on profits and other business factors that your Management must consider in the company's interest."

It is further stipulated:

"Since 1936, the defendant corporation has deducted social security taxes from the amounts of the bonuses paid to its employees; it has deducted the total amount of the bonus payments made as a labor expense and has included these payments under the item 'Salary and Wages' in its income tax returns; for purposes of computing the premium payable on its workmen's compensation insurance it has included at the request of the insurance carrier the bonus payments under the general heading 'Payroll' on the forms submitted by the insurance carrier; in computing its tax liability for purposes of unemployment insurance it has always included as an item of salary and wages paid the amount of the bonus payments in question; and for the periods during which the victory tax and withholding tax deductions have been required to be made from the amounts paid to employees the defendant corporation has deducted these taxes from the bonus payments made to the employees.

"32. Apart from the bonus payments described in Paragraphs 3 to 26 * * * the

company has had in operation productive bonuses since 1924 consisting of two types of incentive bonuses. One type computes a bonus to each individual employee daily for the amount of time saved on standardized operations. The amount of this bonus is paid weekly as part of the employee's earnings. This bonus is paid in the electrical and machine shops. The second type of bonus is * * * paid to a group of employees employed in a separate shop called the bridge shop consisting in the main of structural steel operations. This bonus is paid to the entire group of employees , * * * monthly for the amount of time saved over standardized operations. The combination of both bonuses covers practically all productive operations in the shop. The company has computed all such bonuses in its regular hourly rates of pay for purposes of paying overtime."

Defendant has presented affidavits of Sidney Buckley, its president and general manager, of P. E. Stotenbur, its vice-president, and of six of its employees.

From the Buckley affidavit, verified on April 22, 1947, it appears that the bonus in question was called a "prosperity bonus"; that it began at a meeting of defendant's board of directors held November 17, 1936, when it was suggested "that such bonus be paid without relation to production or earnings but be a gift to the employees"; that deponent, to whom the manner and details of payment were left, "then arbitrarily decided that rather than pay all employees identical amounts that a more just method of distribution would be to have the individual bonus payments in a rough way represent the economic status of the employee in the Shop and in the community. Hence, it was decided to vary the bonus payments according to a fixed scale in relation to the hourly rates paid the employees. Although practically all the employees earned incentive bonuses and worked varying hourly schedules, the bonus was paid on an arbitrarily fixed scale of employees hourly rates regardless of earnings or hours worked."
It is further alleged:

"10. In each single instance of a bonus payment, with the two exceptions described below, the Company's Board of Directors separately discussed, acted upon and authorized each and every individual bonus a few weeks prior to its payment, and no bonus payment was made without the Board's independent authorization. Further, with one of the exceptions referred to above, the Board never authorized more than one bonus payment at any one meeting and never met to discuss bonuses more than once in any bonus period.

"11. The Board, in all instances, required the bonus to be paid as soon as was practicable after each meeting as a reward to those who were employees at the time of its meeting.

"12. No one, including your deponent, knew at any time if a bonus would be paid until the Board of Directors had acted * * *.

"13. The Board at no time gave authority to anyone to pay bonuses without its action. However, this was done by your deponent on one occasion only and that * * is one of the exceptions mentioned above.

"14. That occasion was the payment of the bonus of July 2, 1941. However, deponent secured the Board's approval at its meeting of August 1941.

"15. The other exception, described above, occurred at that August meeting when the Board authorized bonus payments for two months, that month of August and the month of October 1941 following * *.

"17. The bonuses paid had no relation whatever to the bonus worked, years of service, profits, earnings, plant efficiency, the quality of workmanship or efficiency of an individual employee or any group of employees, or any other production factor. They were paid as an exercise of arbitrary discretion on the part of the Board which would in each case decide to reward the employees in any amount it felt was reasonable at that particular moment.

"18. The bonuses had nothing to do with the attendance or absenteeism of an employee or employee group, except that your deponent sometimes had the bonus paid to some employees who did not qualify because of illness or other excusable cause. Sometimes the full amount was given in these cases, and sometimes an arbitrary fraction was given.

"19. The bonus was not based on hours worked."

It further appears that new employees were not informed of this "prosperity bonus"; that no employee was ever informed or promised in advance that any of these bonuses would be paid. The affidavit continues:

"23. The amounts of bonus payments for October and December 1942, the four payments of 1943, and the first three payments of 1944 were in similar amounts with variations in the employees who received the flat sums and some variations in qualifying periods.

"24. The reason for the similarity in amounts during this period was the legal restrictions that prevented increases in bonuses or gifts, or compensation to employees, as ordered by the National Stabilization Board. The bonuses * * * in 1943 and early 1944 would have probably exceeded the amounts paid in previous bonuses if it were not for this restriction. Since the limit of bonus payment was the amount paid in October 1942, these subsequent bonuses were paid to that limit * *.

"26. The bonuses were not paid to make up cost of living increases to the employees. This was done by the constant upward adjustment of hourly rates * * *. In the period from January 1, 1941 to August 1943 increases in straight hourly wage rates alone, on the average, excluding any increases in incentive bonus earnings, exceeded 25%. Straight hourly wage rates increased on an average of 35% between January 1, 1941 to June 1, 1945.

"27. The last bonus that the Company paid of this type was in June 1945.

"28. During the period discussed in this affidavit, with very few exceptions, the scheduled work hours in every week exceeded forty hours * * *. The hours were as follows, in general terms, although there were some variances:

| 1940 | 45 – 55 hours per week |
| 1941 | 55 – 60 " " " |
| 1942 | 55 – 58 " " " |
| 1943 | 50 – 60 " " " |
| 1944 | 55 – 58 " " " |
| 1945 | 50 – 55 " " " " |

The Stotenbur affidavit of May 9, 1947, alleges "that of deponent's knowledge the bonus payments, that are * * * the subject of litigation, were not labeled or included as labor cost in the Company's financial statements, that in reports to stockholders it was included in administrative expense, and in reports to Directors it was separately set forth, distinct from labor or manufacturing costs; That said expense was included in income tax returns as manufacturing and labor costs solely because there is no other category where this expense could properly be reported."

Attached to these two affidavits are form affidavits, all verified on April 21, 1947, by six of defendant's employees, who each allege: "I have received several bonuses at various times from the Company beginning in 1937 which had nothing to do with my wages: these bonuses I consider and have considered to be gifts from the Company and not part of the regular wages at which I have been employed. The Company never promised me any such bonuses nor told me in advance when I would receive any, or the amount which they would be."

■ The Fair Labor Standards Act of 1938 requires the employer to pay to his employee for his employment in excess of the specified hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.A. § 207 (a) (3).

"While the words 'regular rate' are not defined by the Act, they obviously mean the hourly rate actually paid for the normal, non-overtime workweek." Walling v. Helmerich & Payne, 323 U.S. 37, 40, 65 S.Ct. 11, 13, 89 L.Ed. 29. "Presumably Congress refrained from attempting such a definition because the employment relationships to which the Act would apply were so various and unpredictable." Walling v. Belo Corp., 316 U.S. 624, 634, 62 S.Ct. 1223, 1229, 86 L.Ed. 1716.

In the interpretative statement of the Administrator, quoted in Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, at pages 782, 783, it is said: "B. In bonus plans of the second category the employer promises, agrees or arranges to pay a bonus. * * * Bonus payments of this type

will be considered a part of the regular rate at which an employee is employed, and must be included in computing his regular hourly rate of pay and overtime compensation." In Category A, the employer has not "previously promised, agreed or arranged to pay such bonus."

In Walling v. Richmond Screw Anchor Co., 2 Cir., 154 F.2d 780, 785, certiorari denied 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640, Frank, J. says: "If, said the Administrator, the employer pays a bonus 'without having previously * * * arranged' to do so, then it does not count, but it does count if he 'arranges' to grant a bonus with regularity and if the amount thereof 'may be ascertained by the application of a formula.' "

He admitted, however, "To be sure, the Supreme Court has not yet considered a bonus arrangement involving no contractual obligation." 154 F.2d 784.

The Richmond Screw Anchor Co. case, in some respects, resembles the case at bar. In the opinion of the District Court it is said: "The resolution of the Board of Directors probably does not rise to the dignity of a contract. * * * The employees are actually and regularly receiving 10% more than what is called the 'regular rate' which is used as a basis for overtime. And if such a system can be held permissible and lawful because the additional weekly compensation has some of the legal incidents of a gift, rather than those of a payment under a contract, then the purposes of the act can always be defeated in a very simple way." 59 F.Supp. 291, 292, 293.

In other essential respects the Richmond Screw Anchor Co. case differs from the case at bar. There the bonus in dispute was the only bonus paid the employees. In the instant case, defendant paid "two types of incentive bonuses" and "computed all such bonuses in its regular hourly rates of pay for purposes of paying overtime."

The nature of the bonus in the cited case is thus described in the opinion of the District Court: "Since 1933 the defendant has made bonus payments to its employees generally. The first annual bonus payment was made at the end of 1936. It amounted to 10% of the yearly base pay. On April 3, 1942, at a special meeting of the defendant's board of directors, it was unanimously agreed that all employees of the firm should be given a monthly bonus in the form of war stamps, the amount of the bonus to be, in the case of each employee, 10% of his weekly base salary for the previous month, commencing in June 1942. A slight modification in the form of payment was made in October 1942. On that date instead of giving war stamps to the employees, the defendant deposited the earned bonus in individual savings accounts in the East New York Savings Bank in Brooklyn." 59 F. Supp. page 292.

It thus appears that the board of directors provided for the automatic, regular future payments of the bonus. In the instant case, however, defendant's board of directors expressly authorized each payment after the labor had been performed. It did not provide for the future.

In the cited case, the opinion further states: "For some two and one-half years these employees have received these amounts, or been credited with them, regardless of how much or little they produced. In a letter to the Wage and Hour Division of the United States Department of Labor, dated May 14, 1943, the defendant acknowledged that the bonus payments would cease only when the company's finances indicated 'an unhealthy condition'. Moreover, it stated that every employee became entitled to the bonus payment after he had been in service for three months." 59 F.Supp., page 292.

In the case at bar, defendant, in its letter to United States Department of Labor, Wage & Hour & Public Contracts Division, dated August 23, 1943, said in part as follows: "During the year 1942 the Company paid four bonuses to its hourly rate employees. These were paid about every three months and were at the exclusive discretion of the employer. * * * During the year the amounts of the bonuses were increased due principally to the increased cost of living. These amounts, however, have not been increased since October 3, 1942. We wish to continue to pay these bonuses at the amounts which were paid on October 1, and December 17 as we do not wish to decrease the pay of these employees

at the present time. We have a large backlog of government and war orders, and do not wish to have any more labor trouble than necessary so long as we are producing for the war effort."

Affirming the judgment of the District Court, Frank, J., in his opinion cites Walling v. Harnischfeger Corp., 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 427, 65 S.Ct. 1242, 1250, 89 L.Ed. 1705, 1711; Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29.

In the Harnischfeger case, the opinion of the court says: "About one-half of respondent's production employees, called incentive or piece workers, are involved in this case. As a result of collective bargaining by their union, these employees entered into a collective agreement with respondent whereby they are each paid a basic hourly rate plus an 'incentive bonus' or 'piecework earnings.' * * * On many jobs which have not been 'time studied' the respondent has agreed to pay, and does pay, each incentive worker an hourly rate at least 20% higher than his basic hourly rate. * * * These incentive workers frequently work in excess of the statutory maximum workweek. For these extra hours they receive a premium of 50% of the basic hourly rate, which does not reflect the incentive bonuses received. (325 U.S. 428, 429, 65 S.Ct. 1247, 1248).

In holding that these bonuses must be computed as part of the regular pay, it is said: "Once the parties agree that these employees should receive such piece work wages, those wages automatically enter into the computation of the regular rate for purposes of Section 7(a) regardless of any contract provision to the contrary." (325 U.S. 432, 65 S.Ct. 1249).

In the Youngerman case, the employer before the commencement of the trial ceased to use its mode of compensation "and entered into new and more elaborate wage agreements with the stackers (325 U. S. 421, 65 S.Ct. 1243). * * * These agreements on their face contemplated future hourly payments at regular and overtime rates as well as additional piece rate payments." It was held that these "guaranteed piece rates" must be included in computing the regular wage. "The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments. It is not an arbitrary label chosen by the parties; it is an actual fact. Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts." 325 U.S. 424, 425, 65 S.Ct. 1245.

In the Helmerich case, there were contracts whereby the employees received their wages under the so-called "Poxon" or split-day plan. "This plan arbitrarily divided each regular tour into two parts for purposes of calculating and applying hourly wage rates. The first four hours of each eight hour tour, the first five hours of each ten hour tour and the first five hours of each twelve hour tour were assigned a specified hourly rate described as the 'base or regular rate.' The remaining hours in each tour were treated as 'overtime' and called for payment at one and one-half times the 'base or regular rate.' The contracts then recited that the 'base rate' set forth 'shall never apply to more than 40 hours in any workweek.'" (325 U.S. p. 38, 65 S.Ct. 12). This split-day plan was severely condemned as violating the Fair Labor Standards Act.

In these last three cases there was a contract between employer and the employees defining the mode and amount of the latters' compensation.

Plaintiff relies chiefly on the recent Garlock case. In his counsels' memorandum it is stated: "The action was commenced on October 19, 1945. On July 10, 1946, the parties entered into a comprehensive stipulation of facts. Further action in this matter was deferred pending the ruling of the Circuit Court of Appeals in the case then pending before it of Walling v. Garlock Packing Co., 2 Cir., 159 F.2d 44, * * * certiorari denied 67 S.Ct. 1310, since it was believed that the ruling of the Circuit Court in that case would be largely determinative of the issue now presented for adjudication to this Court."

In the Garlock case there was a definite wage plan for the future. The court says: "In June, 1937, defendant corporation promulgated a 'wage premium plan' under which its employees were to receive regular 'wage premiums' or bonuses. (p. 44 of 159 F.2d) * * * In nine years not one quarterly payment has been skipped; employees were informed of the plan when they were hired and looked forward to receiving its benefits throughout the duration of their employment (page 45 of 159 F.2d) * * * Although the employees did not know the exact size of their bonuses or premiums, they did know that the payments would come. Moreover, when defendant determined the size of the dividend, an action governed in the main by considerations other than the wage bonus, the amount of the bonus became fixed and absolute and each employee could then calculate his premium. No independent setting of the amount of the premium by defendant's directors was thereafter required. In actual fact there was substantial regularity in the dividend rate." (page 45 of 159 F.2d)

The appeals in the Richmond Screw Anchor Co. and Garlock cases were decided by the Circuit Court of Appeals—2nd Circuit. The following language in the latter case is significant: "In Walling v. Richmond Screw Anchor Co., supra, we quoted and accepted an interpretative statement by the Administrator as to bonus payments, distinguishing between a bonus not previously agreed upon or arranged (such as a lump sum payment at Christmas time) and one which the employer arranges to grant with regularity. This is certainly of the latter type. He added the further description, 'The amount to be paid may be fixed or may be ascertainable by the application of a formula.' Here the formula was clear from the beginning, with only the rate, already indicated exactly or within narrow limits, to be finally determined by the directors when acting to decide upon the distribution of profits to the stockholders. The difference is made pointed by a case such as Walling v. Frank Adam Electric Co., D.C.E.D. Mo., 66 F.Supp. 811, cited by defendant, where, as the court found, the directors on a number of occasions, and without a promulgated plan, declared bonuses for work already performed and in amounts only then determined. On the court's finding there, it was certainly more justified than we should be here in concluding that the bonuses fell within the Administrator's first category." 159 F.2d pages 45, 46.

A few quotations from the opinion in the Frank Adam case will disclose its similarity to the case at bar. The court said: "The question for determination is whether or not the failure of the defendant to include a 10% bonus in the computation of overtime paid to certain of its employees during the years 1941, '42, '44 and a part of 1945 was a violation of the Act." (66 F.Supp. page 812.)

The court then lists the numerous meetings of the board of directors at which the bonuses were voted. It thus summarizes them: "Thus it will be seen that in each instance (except two or three), during the whole period of time of the payment of this bonus, the provision for the payment thereof was not made by the Board of Directors until near the end of the quarter during which said bonus was to be paid, and after each individual had earned and been paid his or her salary and overtime for that particular quarter. * * * A review of the proceedings of the Board will reveal that when the bonus was first authorized in 1942, it was for the entire year 1941 and the first quarter of 1942. The record clearly shows that thereafter the bonuses were not authorized until the end of each quarter, with the exception of the two instances heretofore noted. Its payment was in no sense based upon any additional service to be rendered by the employee; the bonus was not 'incentive' payments in any sense of the word, no person was required to do any additional work to earn the bonus. As a matter of fact, all of said persons, with possibly one or two exceptions, earned a very considerable amount of overtime which was based upon their regular rate of compensation, and such overtime was in no way connected or tied in with the bonus." (66 F Supp. page 814)

After quoting at length the interpretative statement of the Administrator, dated May 14, 1943 (66 F.Supp. p. 815), the court concludes: "It seems to me that the bonus in this case, which was provided for subse-

quently to the earning of the compensation upon which it was based, is not any part of the regular rate of compensation (66 F. Supp. page 815). * * * If the provision for the payment of the bonus had been made prior to the earning of the regular rate of compensation, then, of course, there would be no difficulty in computing the overtime based upon what the employee expected to receive as a result of the bonus arrangement. But that is not true in this case. It isn't provided for until after the pay has been earned." (66 F.Supp. p. 816)

■ The term "regular rate" as used in the Fair Labor Standards Act is not to be enlarged by reference to the definition of the term "wages" found in other statutes.

In the Richmond Screw case it is said: "The defendant always considered the bonus payments as wages for the purposes of computing the social security, unemployment insurance, withholding and victory tax, and in determining the firm's premiums on workmen's compensation insurance policies. In computing income tax, they deducted bonus payments as expenses; similarly, statements given to the employees—to aid them in preparing their income tax returns—of the wages earned by them during the year, included the bonus payments in question." (154 F.2d p. 782)

Neither the District Court nor the Circuit Court of Appeals, however rested their decisions on this ground but rather on the "crucial fact" that the bonuses "were regularly paid." (159 F.2d p. 45).

No light is thrown on the instant case by the recent decision of Walling v. Wall Wire Products Co., 6 Cir., 161 F.2d 470, because in the latter the bonus was determined by "a collective bargaining agreement."

■ On the facts here stipulated, it appears that this case should be decided in accordance with the principles stated in Walling v. Frank Adam Electric Co., 66 F.Supp. 811, supra, and apparently approved in Walling v. Garlock Packing Co., 159 F.2d 44, supra, at page 46. Moreover, in the affidavit of defendant's president and general manager, verified on April 22, 1947, it is alleged: "27. The last bonus that the Company paid of this type was in June 1945."

For these reasons, plaintiff's motion for summary judgment must be and is denied and the complaint dismissed.